## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————
                                                          )
**GAYLE GARDNER, TANYA PULISCIANO,**       )
**CRYSTAL CAISSIE, LOUISE FELTEAU,**          )          **Civil Action Nos.**
**MARIA IOCCO, CHARLES VARNES, and**       )          **09-11806-FDS**
**REBECCA VARNES,**                                   )
                                                          )
    **Plaintiffs,**                                      )
                                                          )
    **v.**                                                  )
                                                          )
**SIMPSON FINANCING LIMITED**                  )
**PARTNERSHIP, FIRST AMERICAN**             )
**PROPERTY & CASUALTY INSURANCE**        )
**COMPANY, and MULTIFAMILY**                  )
**COMMUNITY INSURANCE AGENCY, INC.,**    )
                                                          )
    **Defendants.**                                    )
———————————————————————)

## MEMORANDUM AND ORDER ON DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

    In May 2008, the apartment building in which plaintiffs lived was destroyed by fire.

Plaintiffs Gayle Gardner, Crystal Caissie, Louise Felteau, Maria Iocco, Tanya Pulisciano, and

Charles and Rebecca Varnes had purchased insurance from defendant First American Property &

Casualty Insurance Company through a program under which they were added as additional

insureds to the policy of the landlord, defendant Simpson Financing Limited Partnership.

Plaintiffs each brought separate actions against Simpson, First American, and an insurance agent,

defendant Multifamily Community Insurance Agency, Inc. ("MCIA").

    Defendants have moved for partial summary judgment.  For the reasons stated below,

summary judgment will be granted in part and denied in part.

## I.      Factual Background

The facts are stated in the light most favorable to the plaintiffs unless otherwise noted.[1]

Simpson Financing Limited Partnership is the owner of an apartment complex in

Peabody, Massachusetts, known as "Highlands at Dearborn." (Pressley Aff. ¶ 11). As of May

2008, the complex included a building at 8 Ashford Trail. (*Id.*).

First American Property & Casualty Insurance Company is an insurance company

licensed to issue property and casualty insurance, including homeowner's and renter's insurance,

in Massachusetts. (Court Aff. ¶¶ 3-4). MCIA is an authorized agent of First American in

Massachusetts. (*Id.* ¶ 6).

Plaintiffs rented units or renewed leases for units in 8 Ashford Trail on various dates

between August 2007 and March 2008.[2] Each plaintiff signed a lease (or a renewal to their lease)

that included an addendum concerning liability insurance. (Gardner Dep. at 54-55; Caissie Dep.

at 37-38; Felteau Dep. at 10, 35; Iocco Dep. at 38; Pulisciano Dep. at 28; C. Varnes Dep. at 20).

Paragraphs 2 through 4 of the addendum state as follows:

> **2. Acknowledgment Concerning Insurance or Damage Waiver.**  You
> acknowledge that we do not maintain insurance to protect you against loss or
> damage to your personal property or belongings, or to cover your own liability for

---

[1] Plaintiffs have attempted to dispute various assertions of fact in defendants' affidavits on the ground that the witnesses are not credible, without offering any actual evidence as to lack of credibility. Such bare assertions of lack of credibility are not sufficient, standing alone, to establish a disputed issue of material fact. *LaFrenier v. Kinirey*, 550 F.3d 166, 167 (1st Cir. 2008) ("[A] plaintiff may not defeat summary judgment by merely asserting that the jury might, and legally could, disbelieve the defendant's denial." (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

[2] The Highlands was originally owned by Fairfield Development LLP. (*See* Pressley Aff. ¶ 7). Simpson Property Group managed the Highlands for Fairfiled from May 15, 2007, to August 17, 2007. (*Id.*). On August 17, Simpson purchased the property from Fairfield. (*Id.* ¶ 11, Ex. A).

injury, loss or damage you (or your occupants or guests) may cause others.  You also acknowledge that by not maintaining your own policy of personal liability insurance, you may be responsible to others (including us) for the full cost of any injury, loss or damage caused by your actions or the actions of your occupants or guests.  You understand that paragraph 8 of the Lease Contract requires you to maintain a liability insurance policy . . . .[3]

**3. Required Policy.**  You are required to purchase and maintain personal liability insurance covering you, your occupants and guests, for personal injury and property damage any of you cause to third parties (including damage to our property), in a minimum policy coverage amount of $25,000.00, from a carrier with an AM Best rating of A-VII or better, licensed to do business in Massachusetts.  The carrier is required to provide notice to us within 30 days of any cancellation, non-renewal, or material change in your coverage.  We retain the right to hold you responsible for any loss in excess of your insurance coverage.

**4. No Referral.**  You acknowledge that we have made no referrals, guarantees, representations, or promises whatsoever concerning any insurance or services provided by any insurance company.  You were and are free to contract for the required insurance with the provider of your choosing.

(Liability Insurance Lease Add., First American/MCIA Mem. Ex. 11).  The lease agreements did

not require any tenant to purchase property or contents (as opposed to liability) coverage.

Prior to entering into their leases, Simpson's leasing agent advised plaintiffs that they

were required to have renters' insurance to rent the unit.  The agent advised them to participate in

the Registry TLC Program.  (Gardner Aff. ¶¶ 4-5; Caissie Aff. ¶¶ 4-5; Felteau Aff. ¶¶ 4-5; Iocco

---

[3] Paragraph 8 of the Lease Contract states in relevant part:

We do not maintain insurance to cover your personal property or personal injury.  We are not responsible to any resident, guest or occupant for damage or loss of personal property from (including but not limited to) fire, [or] smoke, . . . unless otherwise required by law.

We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like.

Additionally, you are . . . required to purchase personal liability insurance.

(Lease ¶ 8, First American/MCIA Mem, Ex. 11).

Aff. ¶¶ 4-5; Pulisciano Aff. ¶¶ 4-5; C. Varnes Aff. ¶¶ 4-5; R. Varnes Aff. ¶¶ 4-5).[4]

The Registry TLC Program is a program offered by First American whereby renters can obtain insurance.  Simpson is the named insured on a Master Policy of "Landlord-Placed Liability Coverage (Contents Optional)" ("Landlord Master Policy") issued by First American. (Court Aff. ¶¶ 11-13, Ex. 1).  Renters who participate in the program are not issued entirely separate policies; instead, Simpson adds residents who choose to participate in the Registry TLC Program to the policy as additional insureds.  (*Id.* ¶ 15, Ex. 1).  Whenever Simpson adds a resident to the Landlord Master Policy, First American bills Simpson for the additional cost of insuring a tenant.  (*Id.* ¶¶ 15, 21, Exs. 1, 2).  The program gives residents the option of purchasing only liability coverage or adding contents coverage for an additional charge.  (*See* Felteau Dep. at 19-20).  The cost of the program is then added to the residents' monthly rent. (*See id.*; Pressley Aff. ¶ 33).[5]

Plaintiffs elected to participate in the program.  Accordingly, upon executing or renewing their leases, Simpson added plaintiffs to the Landlord Master Policy.  (Court Aff. ¶ 26).  Gardner, Caissie, Felteau, and Charles and Rebecca Varnes obtained $25,000 of liability coverage and $15,000 of contents coverage.  (*Id.* ¶¶ 28, 34, 39, 49).  Pulisciano and Iocco obtained only

---

[4] Plaintiffs' affidavits are nearly identical.  Unless otherwise indicated, the Court will cite them collectively.

The Court notes that several portions of plaintiffs' affidavits directly contradict their earlier deposition testimony.  Absent a satisfactory explanation for changing their testimony, plaintiffs cannot rely on their contrary statements in their affidavits to create a genuine issue of material fact and survive summary judgment.  *Colantuoni v. Alfred Calcagni & Sons*, 44 F.3d 1, 4-5 (1st Cir. 1994).

[5] The Master Policy Acknowledgment form states that "[n]on-licensed persons may not sell policies nor advise residents on insurance matters," and that the leasing team "should refer any questions with respect to this policy to [First American] customer service."  (Court Aff., Ex. 2, ¶ 10; *see also id.* ¶ 18).

liability coverage.  (*Id.* ¶¶ 44, 53).[6]  After each plaintiff signed their lease or lease extensions, and

signed up for the Registry TLC program, First American sent them a letter.  The letter stated:

> Your landlord has arranged insurance coverage for you through First American
> Property & Casualty Insurance Company per your request.  This insurance is
> important because it provides liability coverage up to the policy limits and
> conditions, and satisfies a condition in your lease.

(*Id.* ¶ 17, Exs. 3, 4, 5, 6, 7, 8, 9).[7]  A page entitled "Evidence of Insurance" that contained

information applicable to each individual plaintiff was attached to the letter.  (*Id.*; *see also id.* ¶

16).  The bottom of the Evidence of Insurance page stated, in all capital letters:

> This is not a policy of insurance, but an evidence of insurance certifying coverage
> under the policy number shown above and issued to the landlord to protect their
> interest in the tenant's rental unit.  The landlord holds the policy explaining the
> coverage being provided to the tenant and the tenant's copy is enclosed.  If you
> have any questions regarding this insurance, please call our customer service
> department . . . .

(*Id.*, Exs. 3, 4, 5, 6, 7, 9).  Plaintiffs paid their insurance premiums under the Registry TLC

Program by paying extra amounts to Simpson along with their rent.  (Pl. Affs. ¶ 12; *see also*

Felteau Dep. at 20).[8]

Some plaintiffs believed that they had purchased their own renters' insurance policy

through Simpson; they did not understand that they were added to the Landlord Master Policy.

---

[6] Pulisciano testified that she understood the difference between liability and contents coverage and opted for the less-expensive option.  (Pulisciano Dep. at 23-27).  Iocco testified that she is a licensed insurance agent and chose to obtain only liability coverage for financial reasons.  (Iocco Dep. at 20, 61-62).

[7] Several plaintiffs do not remember receiving documents from First American.  (*See* Caissie Dep. at 26; Iocco Dep. at 42 (did not receive policy, but received insurance certificate); Pulisciano Dep. at 17).

[8] Plaintiffs did not communicate directly with First American or MCIA during this process, but dealt only with representatives of Simpson.  (Gardner Dep. at 62-63; Caissie Dep. at 25-26; 93; Felteau Dep. at 10, 24; Iocco Dep. at 42-43; Pulisciano Dep. at 34; R. Varnes Dep. at 21).

(Pl. Affs. ¶¶ 11, 13).[9]  When signing the lease, some plaintiffs contend that they were not given an opportunity to purchase renter's insurance other than through the Registry TLC program and they were not aware (or it did not occur to them) that they could purchase additional insurance after entering into the lease.  (Pl. Affs. ¶¶ 7, 9).[10]

On May 28, 2008, the building plaintiffs lived in at 8 Ashford Trail was destroyed when bark landscaping mulch used on the property caught fire.  (Gardner Compl. ¶¶ 41-45).  First American, in accordance with the terms of the insurance policy, paid Gardner, Caissie, Felteau, and Varnes $15,000 for property damage due to the fire.  (Gardner Dep. at 68; Caissie Dep. at 51; Felteau Dep. at 43; C. Varnes Dep. at 26; R. Varnes Dep. at 45; *see also, e.g.*, Gardner's Resp. to First American's Interrog. No. 21 ("I do not contend that [First American] failed to pay all sums do to me under the insurance policy.")).

## II.   Procedural Background

Plaintiffs brought separate actions in the Massachusetts Housing Court, Northeast Division, against defendants alleging negligence, negligent infliction of emotional distress, intentional and negligent misrepresentation, breach of contract, breach of the covenant of quiet enjoyment, nuisance, and violation of Mass. Gen. Laws ch. 93A.  On October 26, 2009, defendants removed the actions to this Court on the basis of diversity of citizenship.  The actions were then consolidated.

All three defendants have moved for summary judgment as to Count 3, alleging

---

[9] Other plaintiffs testified that they received information that the insurance was purchased on behalf of their landlord.  (*See, e.g.*, Gardner Dep. at 50).

[10] Some plaintiffs testified they were aware they could get insurance from other sources.  (*See* Gardner Dep. at 59, 62; Felteau Dep. at 21; Iocco Dep. at 60).

intentional misrepresentation; Count 4, alleging negligent misrepresentation; Counts 5, 10 [sic],

and 11, alleging breach of contract; and Counts 7, 9, and 10, alleging violation of 93A.  Simpson

has moved for summary judgment as to the claims of Iocco and Charles and Rebecca Varnes in

Count 2, alleging negligent infliction of emotional distress, and Count 8, alleging nuisance.[11]  For

the following reasons, the motions will be granted in part and denied in part.

## III.   **Legal Standard**

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Balser v.*

*Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers (IUE) Local 201*, 661 F.3d 109,

118 (1st Cir. 2011).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB*

*Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986)).  In making that determination, the Court views "the record in the light most

favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples,*

*Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment

is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for

trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The non-

moving party may not simply "rest upon mere allegation or denials of his pleading," but instead

must "present affirmative evidence."  *Id*. at 256-57; *Balser*, 661 F.3d at 118 ("To defeat a motion

---

[11] The complaints name two counts as "Count 10."  To avoid confusion, the Court will list the breach of contract count as "Count 10 [sic]."

7

for summary judgment, the non-movant must tender significant probative evidence . . . .  Brash

conjecture, coupled with earnest hope that something concrete will eventually materialize, is

insufficient to block summary judgment." (citation and quotations omitted)).

**IV.**     **Analysis**

      **A.**     **Intentional and Negligent Misrepresentation (Count 3)**

      To prove intentional misrepresentation in Massachusetts, "the plaintiff, at a minimum,

must establish that the defendant 'made a false representation of a material fact with knowledge

of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff

reasonably relied upon the representation as true and acted upon it to his damage.'"  *Russell v.*

*Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 458 (2002) (quoting *Danca v. Taunton Sav. Bank*,

385 Mass. 1, 8 (1982)); *Aliberti v. GMAC Mortg., LLC*, 779 F. Supp. 2d 242, 248 (D. Mass.

2011).  The plaintiff need not show "actual intent to deceive on the part of the defendants"; it is

sufficient to show that defendants made a statement that they knew was false and that the

statement was not a simply a matter of opinion.  *Russell*, 437 Mass. at 458-59 (quoting *Powell v.*

*Rasmussen*, 355 Mass. 117, 118 (1969)).

      To prove negligent misrepresentation in Massachusetts, plaintiffs must allege that

defendant "'(1) in the course of his business, (2) supplied false information for the guidance of

others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those

others (5) by their justifiable reliance on the information, and that he (6) failed to exercise

reasonable care or competence in obtaining or communicating the information.'"  *Braunstein v.*

*McCabe*, 571 F.3d 108, 126 (1st Cir. 2009) (quoting *Gossels v. Fleet Nat'l Bank*, 453 Mass. 366,

902 (2009)).  "A claim of negligent misrepresentation is ordinarily one for the jury, unless the

undisputed facts are so clear as to permit only one conclusion." *In re TJX Cos. Retail Sec. Breach Litig.*, 524 F. Supp. 2d 83, 91 (D. Mass. 2007) (quoting *Nota Constr. Corp. v. Keyes Assocs.*, 45 Mass. App. Ct. 15, 20 (1998)).

Under Fed. R. Civ. P. Rule 9(b), misrepresentation must be pleaded with specificity. *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29-30 (1st Cir. 2004); *International Floor Crafts, Inc. v. Adams*, 477 F. Supp. 2d 336, 341 (D. Mass. 2007); *see also North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15-16 (1st Cir. 2009).[12]   To satisfy this requirement, the complaint must "specify the who, what, where, and when of the allegedly false or fraudulent representation." *Alternative Sys. Concepts, Inc.*, 374 F.3d at 29; *Adams*, 477 F. Supp. 2d at 341 ("[A] claimant alleging fraud or mistake must provide particulars as to the time, place and content of the alleged false or fraudulent misrepresentation.").

Defendants contend that the complaints do not allege misrepresentation with the particularity required by Rule 9(b).  The complaints allege that employees of Simpson

---

[12] It is unclear whether Rule 9(b) always applies to a claim of negligent misrepresentation. *Compare Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 41 (1st Cir. 1998) (reasoning that plaintiff brought a claim for negligent misrepresentation because the "complaint [did] not plead th[e] claim with sufficient particularity to support a charge of fraud"); *Masso v. United Parcel Service of America, Inc.*, 884 F. Supp. 610, 615 (D. Mass. 1995) ("Rule 9(b) does not apply to a count alleging a negligent misrepresentation."), *with McAdams v. Mass. Mut. Life Ins. Co.*, 2000 U.S. Dist. LEXIS 22068, at *19-*20 (D. Mass. Dec. 13, 2000) ("[F]raud and negligent misrepresentation must be pleaded with particularity under Fed. R. Civ. P. 9(b)." (citing *Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991)); *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 95 (D. Mass. 1998) ("Like fraud, a claim of negligent misrepresentation requires plaintiffs to plead reliance with particularity."); *In re Stratus Computer*, 1992 WL 73555, at *6 (D. Mass. Dec. 10, 1991) ("Rule 9(b) applies to claims of negligent misrepresentation.").

The First Circuit "reads Rule 9(b) expansively to cover associated claims where the core allegations effectively charge fraud." *North American Catholic Educational Programming Foundation, Inc. v. Cardinale*, 567 F.3d 8, 15 (1st Cir. 2009).  Thus, Rule 9(b) applies to claims of negligent misrepresentation where the core allegation is fraud, and likely does not apply where the core allegation is negligence.  *See Massachusetts Sch. of Law at Andover, Inc*, 142 F.3d at 41.

represented to plaintiffs that they were required to purchase insurance through the Registry TCL program, although they were not in fact required to do so.  They also allege that First American represented that their insurance would cover plaintiffs' losses and it did not.  As a consequence, plaintiffs opted into the Registry TLC program rather than purchasing different insurance that would have sufficiently covered their losses.  (*See, e.g.*, Gardner Compl. ¶¶ 79-80, 82, 92-97). Those allegations are sufficiently specific to satisfy Rule 9(b).  *Alternative Sys. Concepts, Inc.*, 374 F.3d at 30.

However, plaintiffs have not adduced any evidence through discovery that any defendants actually made a false statement.  The evidence shows that representatives of Simpson told plaintiffs that they were required to have liability insurance, and that if they did not already have insurance that they could participate in the Registry TLC program to satisfy that requirement.[13] None of those representations were false.[14]   The lease required plaintiffs to purchase liability insurance, and the Registry TLC program satisfied that requirement.[15]  There is no evidence that First American or MCIA made any kind of representation concerning the sufficiency of the

---

[13] To the extent that the allegations in the affidavits that representatives of Simpson advised plaintiffs to obtain insurance could be interpreted as alleging that Simpson told plaintiffs that the Registry TLC program would provide contents coverage, this is contradicted by plaintiffs' prior deposition testimony.  (*See, e.g.*, Gardner Dep. ¶ 54, 59, 62; Caissie Dep. 31-34; Felteau Dep. at 18-20, 43; Pulisciano Dep. at 23-27; Iocco Dep. at 20, 61-62; C. Varnes Dep. at 19-20).  Plaintiffs cannot rely on such subsequent contrary statements to create an issue of fact in order to survive summary judgment.  *Colantuoni*, 44 F.3d at 4-5.

[14] Moreover, Caissie, Iocco, and Charles and Rebecca Varnes signed their lease and opted into the Registry TLC program before May 15, 2007, before Simpson either managed or purchased the Highlands.  (*See* Caissie Dep. 14-15, 20-21, 31-34, 37-38, 94; C. Varnes Dep. at 19; Pressley Aff. ¶ 7-11, Ex. A; Corrected Pressley Aff. ¶ 8) . Thus, there is no evidence that *Simpson* made any representations of any kind to Caissie, Iocco, or Charles and Rebecca Varnes regarding insurance.

[15] Plaintiffs Iocco and Charles Varnes both testified that Simpson's representatives did not say anything untrue regarding the insurance requirement of the lease.  (Iocco Dep. at 61; C. Varnes Dep. at 26).  Gardner testified that a representative of Simpson gave her policy information that indicated that the policy had been purchased the benefit of her landlord.  (Gardner Dep. at 50).

coverage.  Furthermore, plaintiffs testified that First American paid the policy amounts according to the terms of the Registry TLC program.  (Gardner Dep. at 54, 68; Caissie Dep. at 33, 51, 93; Felteau Dep. at 43; Iocco Dep. at 61-62; C. Varnes Dep. at 26; R. Varnes Dep. at 45).

Plaintiffs also contend that Simpson violated various Massachusetts statutes by, among other things, selling insurance without a licensed and by failing to assess their insurance needs. Even assuming Simpson had an obligation to follow these laws and failed to do so, such a failure was not a misrepresentation on Simpson's part.[16]  Plaintiffs have not presented any evidence that representatives of Simpson claimed to be a license insurance agent or claimed they were selling insurance to plaintiffs.[17]  The evidence produced only indicates that Simpson's representatives advised plaintiffs to participate in the Registry TLC program, and, pursuant to that program, Simpson added plaintiffs to the Landlord Master Policy.  Accordingly, defendants' motion for summary judgment as to the claims of intentional and negligent misrepresentation will be granted.

### B.     Breach of Contract (Counts 5, 10 [sic], and 11)

In order to prove breach of contract in Massachusetts, plaintiffs must show "that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage."  *Guckenberger v. Boston Univ.*, 957 F. Supp. 306,

---

[16] These allegations, however, are relevant to plaintiffs' chapter 93A claims.

[17] Moreover, each plaintiff signed a liability insurance addendum to their lease or lease renewal, "acknowledg[ing] that [Simpson has] made no referrals, guarantees, representations, or promises whatsoever concerning any insurance or services provided by any insurance company."  (First American/MCIA's Mem. Ex. 11). Although some plaintiffs do not remember receiving documents from First American, First American sent each plaintiff a copy of the insurance policy and a letter that stated that the policy was "issued to the landlord to protect their interest in the tenant's rental unit," and that the "landlord holds the policy explaining the coverage being provided to the tenant."  (*E.g.*, Court Aff., Ex. 3).

316 (D. Mass. 1997) (citations omitted); *accord Michelson v. Digital Fin. Servs.*, 167 F.3d 715,

720 (1st Cir. 1999).  The elements of a valid contract are an offer, acceptance, and an exchange

of consideration or a meeting of the minds.  *See Vadnais v. NSK Steering Sys. Am., Inc.*, 675 F.

Supp. 2d 205, 207 (D. Mass. 2009).

Plaintiffs contend that Simpson, acting as an agent for First American and MCIA,

contracted to provide plaintiffs with "sufficient insurance."  (*See, e.g.*, Gardner Opp. to Simpson

at 12).[18]  Despite this, the Registry TLC plan only covered liability and $15,000 of contents

coverage, and First American has only paid $15,000 in property damage to plaintiffs Gardner,

Caissie, and Felteau, and to the Varneses.[19]  Plaintiffs do not contend that any of the defendants

breached the express terms of the lease or of the insurance policy, and they agree that First

American has paid the amounts required under the policy.  However, plaintiffs argue that "the

strict terms of the contract are not to be applied" because defendants treated the Registry TLC

program as satisfying the lease requirement that plaintiffs obtain renter's insurance.  (*See, e.g.*,

*id.*).  In essence, plaintiffs contend that because the lease required plaintiffs to have renter's

insurance, and Simpson treated the Registry TLC program as satisfying that requirement of the

lease, there was a contractual obligation to insure plaintiffs adequately against the loss of their

personal property.

As an initial matter, there is nothing in the lease documents, nor is there any other

evidence, to indicate that Simpson agreed to ensure that plaintiffs had "sufficient" insurance

---

[18] The parties dispute whether Simpson was acting as an agent of First American or MCIA.  The Court does not, however, need to reach the issue for purposes of resolving these motions.

[19] Plaintiffs Iocco and Pulisciano only obtained liability coverage and have received no compensation for property damage.

coverage of their personal property or the contents of their apartments.  Both the lease and the

addendum expressly state that Simpson does not maintain insurance coverage for the personal

property of the tenants and encouraged tenants to obtain such coverage on their own.  (Lease ¶ 8,

Lease Add. ¶ 2, First American/MCIA Mem, Ex. 11).  Moreover, plaintiffs testified that they

understood that they were obtaining $15,000 in contents coverage.  (Gardner Dep. at 54, 59;

Caissie Dep. at 33, 93; Felteau Dep. at 43; C. Varnes Dep. at 20).[20]

Furthermore, the lease did not require plaintiffs to purchase contents coverage.  Rather,

plaintiffs were only required to "purchase and maintain personal liability insurance covering you,

your occupants and guests, for personal injury and property damage any of you cause to third

parties (including damage to our property), in a minimum policy coverage amount of

$25,000.00."  (Lease Add. ¶ 3, First American/MCIA Mem, Ex. 11).  Nothing in the lease or its

addenda required plaintiffs to purchase insurance to cover their personal property (although the

lease encouraged them to do so).  The insurance coverage plaintiffs obtained through the Registry

TCL program provided $25,000 in liability coverage.  Thus, even if there were a contract

requiring Simpson provide coverage sufficient to satisfy the insurance requirement in the lease,

Simpson did not breach that contract.

Plaintiffs also contend that a contract to insure all of their personal property loss exists by

---

[20] To the extent that the complaint could be construed as alleging an oral contract to provide coverage
beyond the terms of the written policy, plaintiffs have presented no evidence that Simpson promised or otherwise
agreed to provide more than $15,000 in contents coverage.  (*See, e.g.*, Gardner Dep. at 54, 59 (testifying that no one
ever told her that she had more than $15,000 in property contents insurance and that "no one [had] ever told [her]
that it covered any other amount").

Moreover, assuming that Simpson was acting as an agent of First American, such an agreement would
exceed any apparent authority Simpson may have had.  "Ordinarily an insurance 'agent' has authority only 'to make
valid oral contracts of insurance for some temporary purpose incidental to the issuing of policies for long periods of
time.'"  *McQuaid v. Aetna Ins. Co.*, 226 Mass. 281, 285 (1917) (citation omitted).

operation of Mass. Gen. Laws ch. 175, § 193.  Section 193 states:

> Any policy of insurance or any annuity or pure endowment contract issued in violation of any provision of this chapter shall be valid and binding upon the company issuing it, and the rights, duties and obligations of the parties thereto shall be determined by this chapter.

Mass. Gen. Laws ch. 175, § 193.  As an initial matter, plaintiffs do not appear to contend that the insurance policy they entered into is not valid or binding, only that they thought that the policy provided more coverage than it did.  Section 193 does not expand otherwise legal and valid insurance contracts.  "Rather, § 193 validates illegally issued policies for the limited purpose of protecting the issuer's insureds."  *Clarendon Nat'l Ins. Co. v. Amica Mut. Ins. Co.*, 441 Mass. 248, 256 (2004).  Moreover, and in any event, to the extent that plaintiffs may contend that the insurance policy is invalid because Simpson's employees were not licensed insurance agents, there is nothing in Chapter 175 that entitles plaintiffs to contents coverage beyond the $15,000 that First American paid.  To be sure, under § 193, "the rights, duties and obligations of the parties [to the policy] shall be determined by [Mass. Gen. Laws. ch. 175]," and, therefore, an insurer can be "liable on a contract different from that made by it."  *Id.* at 254 (quoting *Hewins v. London Assurance Corp.*, 184 Mass. 177, 184 (1903)).  However, there do not appear to be any provisions of the insurance policies that are inconsistent with Chapter 175, and therefore the Court will give full effect to all of the provisions of the policies.  *See id.*[21]

Accordingly, defendants' motion for summary judgment as to the breach of contract claims will be granted.

---

[21] Plaintiffs appear to argue that Simpson breached the contract because it did not explain the difference between liability and contents coverage and did not provide guidance to plaintiffs to ensure they purchased sufficient coverage.  However, plaintiffs have not shown that Simpson had a *contractual* obligation to do so.

14

### C.      Violation of Mass. Gen. Laws 93A (Counts 7, 9, and 10)

Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A § 2.  "[A] cause

of action under c. 93A is 'not dependent on traditional tort or contract law concepts for its

definition'" and "is not subject to the traditional limitations of preexisting causes of action."

*Kattar v. Demoulas*, 433 Mass. 1, 12-13 (2000) (citations omitted).  However, the plaintiff must

demonstrate that "the defendant[s'] actions fell within at least the penumbra of some

common-law, statutory, or other established concept of unfairness, or were immoral, unethical,

oppressive or unscrupulous."  *Egan v. Athol Mem. Hosp.*, 971 F. Supp. 37, 47 (D. Mass. 1997)

(quoting *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1484 (1st Cir. 1996)); *VMark Software v. EMC*

*Corp.*, 37 Mass. App. Ct. 610, 620 (1994); *Massachusetts Sch. of Law v. ABA*, 142 F.3d 26, 42

(1st Cir. 1998) ("[T]he conduct must at least come within shouting distance of some established

concept of unfairness.").[22]

In addition to alleging breach of contract and misrepresentation, the complaints allege

that Simpson violated various Massachusetts statutes regulating insurance agents and brokers and

residential landlords.[23]  Specifically, plaintiffs allege that Simpson violated Mass. Gen. Laws ch.

175 §§ 3, 98, 170, 177A-177D, 181, 194, 19; Mass. Gen. Laws ch. 176D § 3(10); and Mass.

---

[22] For example, actionable conduct under the statute encompasses "[a]ctions involving fraudulent representations in knowing disregard of the truth," *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 780 (1986), and "conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party."  *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474 (1991) (quoting *Wang Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 857 (1986)).

[23] Plaintiffs have failed to adduce evidence to support their breach of contract and misrepresentation claims.  Accordingly, to the extent that plaintiffs' chapter 93A claims are dependent upon those claims, the chapter 93A claims will be dismissed.  *See Famm Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 108 (1st Cir. 2009).

15

Gen. Laws ch. 186 §§ 15, 15B.

Plaintiffs have not produced any evidence to show that Mass. Gen. Laws chapters 175 and 176D apply to Simpson.  Simpson is not an insurance agent or broker, and did not sell plaintiffs insurance.[24]  Moreover, plaintiffs have not alleged or presented any evidence that Simpson was paid to provide insurance advice or otherwise publicly held itself out as an "insurance adviser."  *See* Mass. Gen. Laws ch. 175 § 177A.[25]

Plaintiffs also contend that Simpson violated Mass. Gen. Laws ch. 186 §§ 15, 15B. Specifically, plaintiffs argue that by requiring them to purchase liability insurance, the lease illegally required them to indemnify their landlord.  *See* Mass. Gen. Laws ch. 186 § 15 ("Any provision of a lease or other rental agreement relating to real property whereby a lessee or tenant enters into a . . . contract . . . the effect of which is to indemnify the lessor or landlord . . . from any omission, fault, negligence or other misconduct of the lessor or landlord . . . shall be deemed to be against public policy and void.").  However, "an agreement in a lease that the tenant indemnify or hold harmless the landlord is distinct from an agreement to purchase insurance on the landlord's behalf, which covers the liability of both in the event of a negligently caused

---

[24] Plaintiffs also contend that Simpson violated chapter 175, § 98 by not having plaintiffs complete a form to determine the amount of coverage needed.  However § 98 applies only to an "applicant for insurance against loss or damage *to a building* by fire," not liability or contents coverage.  Mass. Gen. Laws ch. 175, § 98 (emphasis added).  Plaintiffs have not cited anything beyond the statutory language that shows that the legislature intended the statute to apply more broadly.  *See Carpenter's Case*, 456 Mass. 436, 446 (2010) ("[T]he statutory language itself is the principal source of insight into the legislative purpose." (citation omitted)); *Harvard Crimson, Inc. v. President & Fellows of Harvard College*, 445 Mass. 745, 749 (2006).

[25] Plaintiffs' affidavits state they were "advised, guided and counseled" by representatives of Simpson to purchase renter's insurance.  (Pls. Affs. ¶ 4).  This is insufficient to create an issue of fact regarding the applicability of Mass. Gen. Laws ch. 175 § 177A, and, in any event, these assertions contradict plaintiffs' earlier deposition testimony that they did not substantively discuss the insurance requirement when signing the lease.  The affidavits therefore cannot be used to defeat summary judgment.  ( *See, e.g.*, Gardner Dep. at 43-45, 95; Caissie Dep. at 14-15, 20-21, 31-34, 37-38; Felteau Dep. at 18-20, 23-24, 28-29; Iocco Dep. at 35-37, 39-40, 60; Pulisciano Dep. at 22-27 C. Varnes Dep. at 14-15, 16, 20; R. Varnes Dep. at 14-15); *Colantuoni*, 44 F.3d at 4-5.

injury." *Norfolk & Dedham Mut. Fire Ins. Co. v. Morrison*, 456 Mass. 463, 473 (2010); *accord Great N. Ins. Co. v. Paino Assocs.*, 364 F. Supp. 2d 7, 23 (D. Mass. 2005); *see also Peterson v. Silva*, 428 Mass. 751, 753 (1999).[26]

Plaintiffs also contend that Simpson violated Mass. Gen. Laws ch. 186 § 15B by charging them the increased cost of Simpson's insurance premiums after adding them to the Landlord Master Policy.  Section 15B(b) states:

> At or prior to the commencement of any tenancy, no lessor may require a tenant or prospective tenant to pay any amount in excess of the following:
>
> (i) rent for the first full month of occupancy; and,
>
> (ii) rent for the last full month of occupancy calculated at the same rate as the first month; and,
>
> (iii) a security deposit equal to the first month's rent . . . and,
>
> (iv) the purchase and installation cost for a key and lock.

Mass. Gen. Laws ch. 186 § 15B(b).  Plaintiffs correctly state that § 15B is unambiguous and that strict compliance is required.  *Hermida v. Archstone*, 2011 WL 5925529, at *3-*4 (D. Mass.

---

[26] Plaintiff argues that the reasoning in *Norfolk* only applies to commercial leases.  Although *Norfolk* dealt with a commercial lease, the court's reasoning is broader.  After generally noting that "[c]ommercial lease provisions requiring a tenant to acquire insurance for the benefit of a landlord have long been recognized and generally upheld." *Norfolk*, 456 Mass. at  471, the court agreed with the analysis in other cases that "[a] contract to procure or provide insurance coverage is clearly distinct from and treated differently than an agreement to indemnify." *Norfolk*, 456 Mass. at 471-73.  The court determined that § 15 applies to commercial as well as residential leases.  *See Norfolk*, 456 Mass. at 467-68.  In so determining, the court stated that "[t]he purpose of the statute . . . is not limited in its applicability to strictly residential leases." *Id.* at 468 (citation omitted).  The court then reasoned that if the legislature wished to limit the statute's reach, it could have "included specific language to that effect." *Id.*  Notably, when determining the scope of § 15 relative to obligations to purchase insurance, the court did not distinguish between residential and commercial leases, and concluded that "[w]hile insurance does result in indemnification, the indemnification obligation does not extend to the tenant. Quite simply, the statute does not apply to insurance provisions, where the duty of indemnification resides, where it should—with the insurer." *Id.* at 474; *cf. Peterson*, 428 Mass. at 753 (stating in regard to a residential lease, that "absent an express provision in a lease establishing a tenant's liability for loss from a negligently started fire, the landlord's insurance is deemed held for the mutual benefit of both parties.").

Nov. 29, 2011) (charging an amenity use fee violates § 15B(b)).  However, as discussed, Simpson could legally require that plaintiffs purchase liability insurance.  *See Peterson*, 428 Mass. at 754 ("Prospective tenants ordinarily rely upon the owner of the dwelling to provide fire protection for the realty (as distinguished from personal property) *absent an express agreement otherwise*. . . .  [The landlord] could have insisted that the [tenants] maintain fire insurance." (emphasis added) (citation omitted)).  Thus, plaintiffs would have paid the cost of insurance premiums even if Simpson did not offer the Registry TLC program.  Unlike a landlord charging tenants an additional amenity-use fee, by maintaining the Master Insurance Policy and adding tenants to it through the Registry TLC program, Simpson was providing an additional service to help tenants comply with a term of their leases.  The legislature designed § 15B primarily to protect the interests of tenants.  *Hermida*, 2011 WL 5925529, at *4; *see also Taylor v. Burke*, 69 Mass. App. Ct. 77, 84 (2007).  It would elevate form over function and undercut these legislative concerns to say that Simpson violated the statute by making it more convenient for tenants to meet their requirements under the lease.[27]  Accordingly, defendants' motion for summary judgment as to plaintiffs' chapter 93A claims will be granted.

## D.    Nuisance (Count 8)

The complaints include a nuisance claim against Simpson for creating a dangerous condition on the property by using flammable bark mulch.  "A private nuisance is actionable when a *property owner* creates, permits, or maintains a condition or activity on his property that

---

[27] Certainly plaintiffs would have a claim under chapter 93A if they produced evidence that Simpson administered the Registry TLC program in an unfair or deceptive manner.  *Cf. Ahern*, 85 F.3d at 798 (stating that although a breach of contract can lead to a chapter 93A violation,"[t]he simple fact that a party knowingly breached a contract does not raise the breach to the level of a Chapter 93A violation").  However, as discussed, plaintiffs have failed to do so.

18

causes a substantial and unreasonable interference with the use and enjoyment of the *property of*

*another*." *Doe v. New Bedford Hous. Auth.*, 417 Mass. 273, 288 (1994) (emphasis in original);

*Morash & Sons v. Commonwealth*, 363 Mass. 612, 616 (1973).  Thus, a nuisance claim requires

two separately owned parcels of real property.  *Doe*, 417 Mass. at 288-289 ("[A]lthough a tenant

has a sufficient interest in rented property to bring a nuisance suit for interference with that

property, the suit can be brought only against the owner of some other piece of property."

(citation omitted)).

Simpson is not alleged to own another property on which there is a condition or activity

that interferes with plaintiffs' enjoyment of their apartments.  Moreover, Simpson is plaintiffs'

landlord.  As a general matter, "a tenant cannot sue his own landlord for a nuisance on the

property that the tenant rents from the landlord."  *Id*.  "A suit for breach of the covenant of quiet

enjoyment is the proceeding a tenant may bring against his landlord for interference with the use

and enjoyment of the rented property."  *Id* at 289 n.16.  The nuisance claim against Simpson will

therefore be dismissed.

### E.   Negligent Infliction of Emotional Distress (Count 2)

Plaintiffs also assert a claim of negligent inflliction of emotional distress against Simpson.

Simpson has moved for summary judgment as to the claims of Iocco and Charles and Rebecca

Varnes.  To recover for negligent inflliction of emotional distress ("NIED") in Massachusetts, a

plaintiff must prove "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm

manifested by objective symptomatology; and (5) that a reasonable person would have suffered

emotional distress under the circumstances of the case."  *Payton v. Abbott Labs*, 386 Mass. 540,

557 (1982).  "A successful negligent inflliction of emotional distress claim . . . must do more than

allege mere upset, dismay, humiliation, grief and anger." *Sullivan v. Boston Gas Co.*, 414 Mass.

129, 137 (1993) (internal citation and quotation marks omitted).  Rather, a plaintiff must present

"enough objective evidence of harm to convince a judge that their claims present a sufficient

likelihood of genuineness to go to trial." *Id.* at 137-38.

When asked in his deposition about physical signs or symptoms of his emotional distress,

Charles Varnes testified that he has never sought medical treatment, and the only things that

bother him are the loss of his dogs and that whenever he hears fire trucks, he thinks it may be

related to his house.  Similarly, Rebecca Varnes testified that as a result of the fire she sometimes

feels anxious when she leaves her house and when she sees emergency vehicles.  These are not

the sort of symptoms that "present enough evidence of physical harm to corroborate a mental

distress claim." *See, e.g.*, *id.* at 138-39 (listing symptoms such as "severe headaches, occasional

suicidal thoughts, sleep disorders, reduced libido, fatigue, stomach pains, and loss of appetite [as]

sufficient physical symptoms of emotional injury to send a case to trial"); *Bernard v. Cameron &*

*Colby Co.*, 397 Mass. 320, 323 (1986).[28]

In her affidavit, Iocco states that as a result of the fire, she has suffered depression and

debilitating headaches.  However, she also suffered from these symptoms before the fire.  (Iocco

Dep. at 47-48, 58).  She contends that her current symptoms were caused by the fire and are

distinct from those she suffered from before the fire.  (Iocco Aff. ¶ 25).  Although she has not

presented any expert or other evidence beyond her affidavit to show causation, these symptoms

---

[28] Both of the Varnes's affidavits, signed after their depositions, state that as a result of the fire they suffer from various physical ailments such as stomach pains, headaches, and nausea.  While these types of symptoms might be enough to corroborate a mental distress claim, *see Sullivan*, 414 Mass. at 138-39, "[w]hen an interested witness has given clear answers to unambiguous questions [in his deposition], he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni*, 44 F.3d at 4-5.

are sufficient for the claim to survive summary judgment.  *Sullivan*, 414 Mass. at 138-39 (stating

"symptoms such as headaches or diarrhea, as well as ailments which impair a person's daily life"

satisfy the physical manifestation requirement).  Whether the fire aggravated Iocco's depression

and headaches is a question that can capably be determined by the jury.  *Cf. Anderson v. W.R.*

*Grace & Co.*, 628 F. Supp. 1219, 1227 (D. Mass. 1986) ("Where . . . the harm is *not obvious to*

*the layman*, its existence may not be demonstrated solely by the complaints of the alleged victim;

it must also be 'substantiated by expert medical testimony.'" (emphasis added)).

Accordingly, summary judgment will be denied as to the NIED claims of Iocco and

granted as to the NIED claims of Charles and Rebecca Varnes.

## V.    Conclusion

For the foregoing reasons, the motions of First American and MCIA for summary

judgment are GRANTED.  Simpson's motions for summary judgment is GRANTED as to

Counts 3, 4, 5, 7, and 8; GRANTED as to the claims of Charles and Rebecca Varnes in Count 2;

and DENIED as to the claims of Maria Iocco in Count 2.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  March 30, 2012