**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

_____
                                                      )
**GAYLE GARDNER, TANYA PULISCIANO,**  )
**CRYSTAL CAISSIE, and LOUISE FELTEAU,**  )            **Civil Action Nos.**
                                                      )            **09-11806-FDS**
    **Plaintiffs,**                              )
                                                      )
    **v.**                                      )
                                                      )
**SIMPSON FINANCING LIMITED**            )
**PARTNERSHIP,**                          )
                                                      )
    **Defendant.**                              )
_____)


**MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL**

**SAYLOR, J.**

    In May 2008, the apartment building in which plaintiffs lived was destroyed by fire.

Plaintiffs Gayle Gardner, Tanya Pulisciano, Crystal Caissie, and Louise Felteau brought an

action for negligence against defendant Simpson Financing Limited Partnership, the entity that

owned and operated the apartment complex.  The case was tried to a jury in April 2013; the jury

found that Simpson was negligent in maintaining the premises and awarded each plaintiff

compensatory damages for loss of property and emotional distress.[1]

    Pending before the Court is Simpson's motion for judgment as a matter of law, or, in the

alternative, a remittitur or new trial.  For the reasons set forth below, the motion will be granted

in part and denied in part.

---

[1] Plaintiffs Iocco and Varnes voluntarily dismissed their claims in the early stages of the trial, apparently
having reached settlements with Simpson.

I.      **Procedural Background**

Plaintiffs brought separate actions in the Massachusetts Housing Court, Northeast Division, against Simpson, as well as First American Property & Casualty Insurance Company and Multifamily Community Insurance Agency, Inc., alleging negligence, negligent infliction of emotional distress, intentional and negligent misrepresentation, breach of contract, breach of the covenant of quiet enjoyment, nuisance, and violation of Mass. Gen. Laws ch. 93A.  On October 26, 2009, defendants removed the actions to this Court on the basis of diversity of citizenship. The actions were then consolidated.

On March 30, 2012, this Court granted summary judgment in favor of the insurance company defendants.  The Court also granted partial summary judgment in favor of Simpson with only the claims for negligence, negligent infliction of emotional distress, and breach of the covenant of quiet enjoyment surviving.

A jury trial was held from April 1 through April 5, 2013.  The evidence at trial consisted of, among other things, testimony from the plaintiffs, employees of Simpson, and representatives of the Peabody Fire Department.  The testimony indicated that there had been multiple fires in the landscaping mulch at the apartment complex prior to the one that burned down plaintiffs' building.  During the testimony of Peabody Fire Inspector Joseph DiFranco, Peabody Fire Department reports were offered into evidence that described the department's response to mulch fires at the Highlands at Dearborn on May 19, 21, and 25, 2008.  (*See* Tr. Day 2 at 69, 75-76, 78-79).  Inspector DiFranco also testified that he suggested to Simpson employees that they could address the fire risk by pulling the mulch away from the buildings, as well as better controlling the disposal of cigarette butts.  (*Id.* at 73, 81).  Andrew Filippone, who was employed

by Simpson as the maintenance supervisor for the Highlands at Dearborn, testified that while he was at the scene of one of the smaller mulch fires on the property, someone from the Peabody Fire Department "recommended bringing the mulch back away from the building a little bit." (*Id.* at 56).  He further testified that he passed this recommendation on to Simpson property manager Victoria Jackman and that the mulch was never in fact pulled away from the buildings before the fire that destroyed Building 8 on May 29, 2008.  (*Id.* at 57).

Also in evidence were two notices, one from the Peabody Fire Department and one issued by the property manager.  The notice from the fire department, which was dated May 27, 2008, acknowledged the repeated mulch fires and instructed the property manager to address improper disposal of cigarette butts and matches; it did not, however, mention moving the mulch away from the buildings.  (*Id.* at 82).  The notice issued by the property manager was dated March 29, 2008, months before the mulch fires occurred, and asked residents not to throw cigarette butts on the ground.  (*Id.* at 30; Tr. Day 4 at 80).  There was no evidence of any other notices having been issued to residents prior to the May 29 fire.

Victoria Jackman testified that the mulch was pulled back from the buildings some time after the May 29 fire.  (Tr. Day 4 at 110).  Jackman gave this testimony in response to questions from plaintiffs' counsel on cross-examination.  Because the Court did not immediately realize that the question sought to elicit testimony as to subsequent remedial measures, it overruled a defense objection to the question, but then gave an immediate curative instruction after it heard the answer.  The exchange transpired as follows:

> MR. D'ANGELO:  . . . what I'd like to ask you is, at some point a decision was made to pull the bark mulch back.  Do you recall when that was?

| | |
|---|---|
| MR. SELIGSON: | Objection. |
| THE COURT: | Overruled. |
| MS. JACKMAN: | A decision was made to pull the mulch back, and it was actually recommended by - |
| MR. D'ANGELO: | That's not my question, I'm sorry, I just want to know when. |
| MS. JACKMAN: | Oh, it was following the fire. |
| MR. D'ANGELO: | Do you know was it the next day, a week, a month? |
| MS. JACKMAN: | I don't recall specifically.  It was early. |
| THE COURT: | Let me caution the jury.  Obviously everyone is encouraged to make things safer after something has happened, and *you cannot use evidence that something was done after the fact to make something safer as proof it wasn't safe before the incident happened.*  We expect and want everyone to learn from incidents and to improve things as time goes on. |

(*Id.*) (emphasis added).

David Homan, a regional manager at Simpson, was the next witness.  He testified on direct—in response to a question by *defense* counsel—that the mulch was pulled back from the buildings a few days after the fire, in consultation with the fire department.  (*Id.* at 133).[2]

---

[2] Defense counsel then objected when plaintiffs' counsel brought up the subject again on cross-examination.  The Court held a sidebar conference that proceeded as follows:

| | |
|---|---|
| THE COURT: | I don't understand why we're talking about subsequent remedial measures.  I don't understand why you [defense counsel] introduced it.  It's prohibited by Rule 407, but you opened the door about pulling the mulch away.  What's the objection as to this? |
| MR. SELIGSON: | Well, your Honor, the reason I introduced it is because the entire time the suggestion has been that they said pull the mulch back. Simpson's response – |
| THE COURT: | Before May 29th? |
| MR. SELIGSON: | Correct.  Simpson's response is after the fire, it was then they said maybe |

Plaintiffs also testified in support of their case.  They each provided a list of items lost in the fire and attributed values to those items; those lists were admitted into evidence without objection.  (*See* Tr. Day 3 at 5-6; *see, e.g.,id.* at 32-38).  They also testified extensively about the mental and physical effects of the fire on their persons.  (*See, e.g., id.* at 42-50).  They each testified that they saw Building 8, which was the building wherein their apartments were located, burning from Route 1, the entrance to the apartment complex, and/or a nearby parking lot. (*See id.* at 21, 65-66, 79-80; Tr. Day 4 at 26-27).  Plaintiffs Caissie, Gardner, and Felteau all testified about the loss of their pets in the fire.  (*See* Tr. Day 3 at 79-84, 29, 37-38; Tr. Day 4 at 26-27).[3]

_____

|  | we should pull the mulch back, so that's what that testimony is for, even though it's not germane, it's more rehabilitating my client in the eyes of the jury that they didn't receive that information and ignore it.  If this is coming in to impeach it, it doesn't come in as evidence, it would come in as an impeachment purpose.  It's clear hearsay. |
|---|---|
| THE COURT: | Mr. D'Angelo[?] |
| MR. D'ANGELO: | He opened the door, your Honor. |
| THE COURT: | He opened the door to an extent. |

(Tr. Day 4 at 138).  After further dialogue, in which the Court excluded a proposed plaintiffs' exhibit, the Court ruled that "You may impeach him on the subject of when the mulch was pulled away from the apartment because it was elicited [by the defense] . . ." (*Id.* At 140-41).  Plaintiffs' counsel then asked:

| MR. D'ANGELO: | Mr. Homan, are you absolutely sure that you pulled the mulch away a couple days after the fire? |
|---|---|
| MR. HOMAN: | Yes, it would have been within that first week. |

[3] Pursuant to Massachusetts law, the Court gave the following instruction to the jury about the loss of pets:

Under the law of Massachusetts, animals, including pets, are considered personal property.  Therefore, in determining the damages, if any, to be awarded to a plaintiff for the death of a pet, your award should be based on the same considerations for determining the value of any other item of personal property.   In other words, your award should reflect the "fair market value" of the pet at the time of the loss.

Of course, people do not typically think of their pets as mere "personal property."  And a pet may not have a readily ascertainable market value.  Nonetheless, the law requires you to treat a pet as property, and does not permit you to include in your award compensation for any mental anguish, or loss of companionship, that occurred solely as a result of the death

Defendant moved for a directed verdict, which the Court denied.  The jury then found in favor of plaintiffs on all counts and awarded compensatory damages for loss of property to plaintiff Gardner in the amount $74,128.00; to plaintiff Pulisciano in the amount of $41,355.57; to plaintiff Caissie in the amount of $47,331.43; and to plaintiff Felteau in the amount of $188,992.02.  The jury also awarded emotional distress damages to each plaintiff in the amount of $450,000.  Defendant has moved for an order of judgment as a matter of law, or in the alternative, for an order of remittitur or new trial.

**II.**     **Standard of Review**

Judgment as a matter of law may be granted when the evidence, considered in the light most hospitable to the verdict, "is so one-sided that [the moving party] is plainly entitled to judgment, for reasonable minds could not differ as to the outcome."  *Colasanto v. Life Ins. Co. of N. Am.*, 100 F.3d 203, 208 (1st Cir. 1996) (citation omitted); *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-51 (2000); *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 75 (1st Cir. 2001) ("[T]he jury's verdict must stand unless the evidence, taken in the light most favorable to the prevailing party, points unerringly to an opposite conclusion.").

Similarly, a court may grant a new trial when "the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice."  *Goulet v. New Penn Motor Express, Inc.*, 512 F.3d 34, 44 (1st Cir. 2008) (quoting *Ramos v. Davis & Geck, Inc.*, 167 F.3d 727, 731 (1st Cir. 1999)); *see also Sheek v. Asia Badger, Inc.*, 235 F.3d 687, 700 (1st Cir. 2000) ("We will uphold the jury's verdict unless the evidence points 'to one conclusion

---

of the pet.

(Tr. Day 5 at 45).

and one conclusion only:  that the losing party was entitled to win.'" (citations omitted)).  "[A] trial judge may order a new trial 'even where the verdict is supported by substantial evidence.'" *Jennings v. Jones*, 587 F.3d 430, 439 (1st Cir. 2009) (quoting *Lama v. Borras*, 16 F.3d 473, 477 (1st Cir. 1994)).

As an alternative to ordering a new trial, a court may order a remittitur of damages in certain rare circumstances.  The First Circuit has held that a district court is "obligated . . . to grant a remittitur or a new trial on damages only when the award 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" *Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Company, Inc.*, 40 F.3d 492, 502 (1st Cir. 1994) (quoting *Milone v. Moceri Family, Inc.*, 847 F.2d 35, 36 (1st Cir. 1988)); *see also Anthony v. G.M.D. Airline Services, Inc.*, 17 F.3d 490, 493 (1st Cir. 1994) (applying the same standard). Courts have interpreted this standard to hold that a damages award must stand unless it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1197 (1st Cir. 1995); *see also Sony BMG Music Entm't v. Tenenbaum*, 2012 U.S. Dist. LEXIS 119243 (D. Mass. Aug. 23, 2012).  When a remittitur is warranted, the plaintiff is given the option of either accepting the remitted damages figure, which is determined by the court to be the maximum amount that could have been awarded based upon the evidence presented at trial, or moving forward with a new trial.  *See Mejias-Quiros v. Maxxam Property Corp.*, 108 F.3d 425, 428 (1st Cir. 1997); *Marchant v. Dayton Tire & Rubber Co.*, 836 F.2d 695, 704 (1st Cir. 1988).

III.   **Analysis**

A.   **Judgment as a Matter of Law**

1.   **Negligence and Breach of Implied Covenant of Quiet Enjoyment**

As to the claims for negligence, the Court instructed the jury that the plaintiffs had to

prove four separate elements:  (1) that defendant owed a duty of care to them; (2)

that Simpson breached that duty; (3) that the plaintiffs each suffered injuries; and (4) that

Simpson's breach of duty was a cause of the injuries.  (Tr. Day 5 at 38).  The jury was also told

that it had to decide "whether Simpson exercised the degree of care that a reasonable landlord

(that is, a landlord of ordinary caution and prudence) would have exercised under similar

circumstances."  (*Id.* at 37-38).

As to the claims for breach of the implied covenant of quiet enjoyment, the Court

instructed the jury that the plaintiffs had to prove three separate elements:  (1) that defendant

leased the premises to them; (2) that acts or omissions of Simpson caused the premises to be

substantially unsuitable for use; and (3) that defendant knew, or reasonably should have known,

that its acts or omissions were likely to cause the premises to be substantially unsuitable for use.

(*Id.* at 41).  The first element was undisputed at trial.  As to the second element, the Court

instructed the jury that "[t]he meaning of 'causation' for the breach of implied covenant claim is

the same as for the negligence claim."  (*Id.* at 42).  Defendant thus contends, as explained more

fully below, that if plaintiffs failed to prove the existence of a duty or that breach of that duty

caused the fire, the jury's verdict on both claims must be reversed.

In the present motion, defendant challenges the jury's verdict as to the existence of a

specific duty to pull back the mulch, and as to defendant's alleged breach of that duty being a

cause of the plaintiffs' injuries.

### a.    Specific Duty of Care

Defendant first contends that the plaintiffs had to prove the existence of a specific duty of care with respect to the placement of the mulch and that expert testimony was required to establish that duty of care.  Defendant contends that without expert testimony establishing the industry standard for the distance flammable mulch should be placed from a building, the members of the jury had no basis for determining whether the landscaping at issue complied reasonably with proper standards of care.

As support for its position, defendant cites to *Stewart v. Worcester Gas Light Co.*, 341 Mass. 425 (1960).  That case involved multiple theories of negligence, including that the gas company negligently installed too close to the home a dresser coupling along the length of a service pipe, and when the coupling separated, gas escaped into the home causing the fire.  *Id.* at 434-35.  The SJC ordered a new trial, holding that the distance between the home and the dresser coupling was a "technical matter" on which the a jury would need "expert guidance" to determine whether it complied with the proper standard of care.  *See id.*  Defendant here contends that the placement of the mulch here is likewise a "technical matter" that the jury would have no basis for evaluating without the aid of expert testimony.  Because no expert testimony was offered, defendant argues, the jury was improperly left to "conjecture and surmise" in reaching their verdict.

Plaintiffs respond that they were not required to prove that defendant had a specific duty to pull back the mulch.  They contend that they only had to prove that defendant had knowledge of a known risk and that a reasonable landlord would have taken steps to address that risk, which

defendant did not.  Furthermore, they point to the testimony of inspector DiFranco as evidence that defendant was, in fact, specifically warned about the proximity of the mulch to the buildings.

First, the Court notes that the jury instructions included the statement, "[i]t is undisputed that defendant owed a duty to the plaintiffs as their landlord."  (Tr. Day 5 at 39).  The instruction also explained that "a landlord has a duty to take action when it becomes aware, or reasonably should become aware, of an unreasonably dangerous condition on the premises . . . and the nature of the action required to be taken . . . depends upon the circumstances of each case."  (*Id.* at 38-39).  Defendant did not object to those instructions, and defendant's proposed jury instructions did not request an instruction that plaintiffs were required to prove the existence of a specific duty to pull back the mulch.  Accordingly, at a minimum it appears that defendant has waived its right to move for a judgment as a matter of law on the basis that plaintiffs failed to prove that defendant had a specific duty to pull back the mulch.  However, because defendant's contentions can be construed as challenging plaintiffs' ability to prove "the nature of the action to be taken" in response to a dangerous condition, the Court will address the merits of the motion on this issue.

In a negligence action, the plaintiff must prove the contours of a duty of care with expert testimony when "lay persons could not easily appraise the . . . alleged negligence as a matter of common knowledge."  3 PERSONAL INJURY § 11.09 (MB, 2013).  Defendant's position misconstrues the theory of the case and inappropriately narrows the duty of care at issue, which was a landlord's duty to address a known risk.  Plaintiffs did not have to prove that, in the absence of notice of a risk, a landlord has a duty to place mulch a particular distance from a

building.  The *Stewart* case, on which defendant heavily relies, illustrates the point.  In that case,

the SJC found that expert testimony was required to support plaintiffs' theory that the gas

company should not have installed a dresser coupling within a certain distance of the residence.

*Stewart*, 341 Mass. at 435.  Another of the plaintiffs' theories of recovery was based on the gas

company's response to the report of a gas leak on the day of the fire.  With respect to that theory,

the SJC did not even address the issue of proving the duty of care by expert testimony, and

instead simply found that there was lack of evidence that the gas company breached it.  *Id.* at

434; *cf. Russo v. Mystic Valley Gas Co.*, 5 Mass. App. Ct. 849 (Mass. App. Ct. 1977) (reinstating

a jury verdict on a charge of negligence in failing to respond promptly to notification of a gas

leak).  Indeed, the great majority of case law in this area deals with the installation of utility

lines, appliances, or other construction projects.  *See, e.g., Kenney v. Sears, Roebuck & Co.*, 355

Mass. 604 (1969); *McCabe v. Boston Consol. Gas Co.*, 314 Mass. 493 (1943); *Webb Granite &

Constr. Co. v. Boston & M. R. R.*, 206 Mass. 572 (1910).  In all of those situations, the conduct at

issue occurred before a specific risk had been identified; the risk at issue was the inherent danger

of gas or electricity.  Here, in contrast, the risk at issue was not the inherent danger of mulch, but

the unique and specific danger of the mulch surrounding these buildings and its known

propensity to catch fire from careless disposal of smoking materials.  *See Shantigar Found. v.

Bear Mt. Builders*, 441 Mass. 131, 144 (2004) ("Massachusetts law recognizes that in the

absence of a statutory duty to [take certain fire prevention measures], a jury could find such a

duty when the owner knows of a 'particular danger of fire.'"); *accord Little v. Lynn &

Marblehead Real Estate Co.*, 301 Mass. 156, 161 (1938) (holding that "[n]ot having been shown

to have knowledge of any particular danger of fire, the defendant was not obliged to take

precautions to guard against it").

In *Stewart*, the SJC also held that expert testimony was not required to establish whether the duty of care for a gas company included shutting off the gas line at the street when a patron discontinues service.  341 Mass. at 434.  In so holding, the SJC concluded that the jury could determine the standard of care from the evidence and their common experience and that the "question was not so dependent on expert engineering knowledge that a jury could have no basis of decision without expert testimony."  *Id.*

Here, the question of whether defendant's duty of care as landlord included moving the mulch away from the buildings, after having experienced multiple fires in the mulch over a short period of time, is similarly ascertainable by drawing on common knowledge and experience.  In addition, inspector DiFranco testified that he specifically suggested pulling the mulch away from the building.  Under the circumstances, the Court finds that the jury could have had a reasonable basis in the evidence for its decision.

### b.    Causation

Defendant contends that expert testimony was also necessary to prove that the proximity of the mulch to the building caused the fire to spread to the building.  Defendant cites *Little*, 301 Mass. at 159-60, for the proposition that plaintiffs in a negligence claim must prove a causal connection between a particular condition on a defendant's property and the spread of a fire to an adjoining building.  Defendant then cites a line of Massachusetts cases purportedly holding that expert testimony is required to establish the cause of a fire, and a jury may not speculate on the cause of a fire.  *See, e.g., Enrich v. Windmere Corp.*, 416 Mass. 83, 88-89 (1993).  Combining these two principles, defendant contends that plaintiffs were required to offer expert testimony as

to the existence of a condition that caused the fire to spread from the mulch to the building.

Defendant's reliance on *Little* is misplaced. In that case, there was no evidence as to the cause of a fire in landlord defendant's building, but there was evidence that the fire spread to plaintiff's building because the landlord had temporarily disabled the sprinkler system while it was under repair. *Little*, 301 Mass. at 158-59. The court held that because there was no evidence to suggest that the fire started as a result of landlord's act or omission, the plaintiff was required to prove that defendant was aware of the fire to hold it liable for the spread. *Id.* at 160. The court, however, made no mention of whether or not expert testimony was required to demonstrate that the lack of sprinklers caused the fire to spread.

Unlike *Little*, there was evidence here that defendant was aware both of this specific fire before it spread to the building and of the increased risk of mulch fires on the premises generally. Defendant thus had the obligation to exercise reasonable care to ensure that the fire, or any potential fire created by the dangerous condition, did not spread to the building. There was evidence here that the mulch was up against the building's siding and next to the gas meter. Inspector DiFranco testified that the proximity to the gas line caused the fire to spread more quickly. A reasonable jury could have found, based on this evidence and their common knowledge, that it was more likely than not that the proximity of the mulch to the building, which included the gas line, was a cause of the fire spreading and ultimately engulfing the entire building. *See Deerfoot Farms, Inc. v. New York, N. H. & H. R. Co.*, 327 Mass. 51, 54 (1951) (holding that "[t]he fact that the fire was communicated to other property may reasonably be inferred from common knowledge of the 'operation of the established laws of nature in the familiar forms of combustion … and the effects of wind on fire'") (quoting *Gates v. Boston &*

*Maine Railroad*, 255 Mass. 297, 302 (1926)); *see also Commonwealth v. Levesque*, 436 Mass. 443, 454 (2002) (holding that "[e]ven without [] expert testimony, the grand jurors' common knowledge of the nature of fire would have allowed them to conclude that a fire spreads and becomes more dangerous the longer it is left unattended").

Furthermore, the initial cause of the fire was not at issue. In many of Massachusetts cases specifically requiring expert testimony on the issue of a fire's cause, the claims were based on an allegation that a defective product or condition caused the fire. *See, e.g., Enrich*, 416 Mass. 83; *Kenney v. Sears, Roebuck & Co.*, 355 Mass. 604 (1969); *Safety Ins. Co. v. Home Store, Inc.,* 18 Mass. L. Rep. 688 (Mass. Super. Ct. 2005). In those cases, the courts generally required expert testimony to establish that the alleged defect was the most likely source of the fire, as opposed to other potential sources, such as electrical fire in a building's wiring or fuse box. *See, e.g., Enrich*, 416 Mass. at 85. Other cases cited by defendant as support for their position on expert testimony merely stand for the principle that there must be some proof of a fire's cause and the issue cannot be decided by the application of *res ipsa loquitor*. *See, e.g., Triangle Dress, Inc. v. Bay State Serv., Inc.*, 356 Mass. 440, 441-42 (1969) ("There was no direct evidence of the cause of the flames. There was not only a complete absence of expert opinion testimony but it seems to us a lack of evidence establishing facts upon which an expert opinion could be predicated."); *A. Shapiro Realty Corp. v. Burgess Bros., Inc.*, 491 F.2d 327, 331 (1st Cir. 1974) (upholding a district court's determination not to give a *res ipsa loquitor* instruction because "outbreak of a fire is not evidence of negligence on the part of owner of premises").

Here, plaintiffs conceded that the initial cause of the fire in the mulch was not a defect or even defendant's negligence, but rather the careless disposal of smoking materials. Inspector

DiFranco also testified to that fact.  Plaintiffs proceeded on a theory that the known risk of a mulch fire caused by the careless disposal of smoking materials imposed a duty on the landlord to address it, and that defendant's failure to address that risk caused the fire to spread to the building.  As noted, there was sufficient evidence from which the jury could reasonably conclude that defendant's failure to act caused the fire to spread quickly to the building.  The jurors were also entitled to rely on their "common knowledge of the nature of fire" in determining what facilitated the spread of the fire in terms of the mulch's proximity to other flammable materials on the building.  *Levesque*, 436 Mass. at 454; *see also* Gates, 255 Mass. at 302 (holding that "[t]he operation of the established laws of nature in the familiar forms of combustion, the tendency of fire to persist when once started in wood, and the effects of wind on fire, are matters of common knowledge").

Here, the Court instructed the jury that plaintiffs had to prove that "Simpson's breach of duty, if any, was a cause of their injuries . . . [or, in other words, that] the harm would not have occurred absent the defendant's breach of duty."  (Tr. Day 5 at 40).  Again, defendant did not object to this instruction or offer a proposed alternative that required plaintiffs to prove specific causation as to the spreading of the fire.  In any event, plaintiffs did offer evidence of the specific reasons that fire spread and spread quickly, and the jury could reasonably credit that evidence.

Accordingly, the defendant's motion for judgment as a matter of law will be denied as to the claims for negligence and breach of the implied covenant of quiet enjoyment.

### 2.    <u>Emotional Distress</u>

The Court instructed the jury that in order to award compensatory damages for emotional distress, each plaintiff had to prove that (1) she suffered emotional distress and (2) she

experienced an objective manifestation of that emotional distress.  The Court explained that

objective manifestations of emotional distress are physical symptoms such as severe headaches,

insomnia, muscle tension, fatigue, nausea, vomiting, depression, shortness of breath,

uncontrollable crying spells, or loss of appetite.  *See Sullivan v. Boston Gas Co.*, 414 Mass. 129,

138-39 (1993) (listing symptoms such as "severe headaches, occasional suicidal thoughts, sleep

disorders, reduced libido, fatigue, stomach pains, and loss of appetite [as] sufficient physical

symptoms of emotional injury to send a case to trial"); *Gutierrez vs. Mass. Bay Transportation

Authority*, 437 Mass. 396 (2002) (listing symptoms as depression, shortness of breath,

nightmares, uncontrollable crying spells, depression, anger, anxiety, and citing two earlier cases

that involve those symptoms).  The Court did not instruct the jury that objective manifestations

had to be proved by corroborating evidence.  Defendant did not propose that such an instruction

be given.

Defendant now contends that the jury's verdict must be set aside as to the awards of

emotional distress damages, because plaintiffs failed to corroborate their physical symptoms

with objective evidence, instead relying only their own testimony.  Defendant cites *Sullivan* for

the proposition that plaintiffs needed to offer more evidence than simply their own testimony

that they were upset, dismayed, humiliated, or angry.  414 Mass. at 137.

The SJC has clarified that the ruling of *Sullivan* addressed "the range of symptoms that

may provide the type of objective evidence to prove physical harm."  *Gutierrez*, 437 Mass. at

412.  The SJC indicated that *Sullivan* removed the requirement that "plaintiffs had to substantiate

the objective symptomatology with expert medical testimony."  *Id.* (internal citations omitted).

As the *Sullivan* court explained, the overall goal of the rule is to ensure that plaintiffs

"corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness to go to trial."  414 Mass. at 137-138.

In *Kelly v. Brigham & Women's Hosp.*, 51 Mass. App. Ct. 297 (2001), the Massachusetts Appeals Court considered a case where the only evidence of objective physical symptoms was the plaintiff's own testimony that she had "cramps, shortness of breath, and nightmares." *Id.* at 306.  The court held that "[w]hile it is true that these complaints could be self-serving, the defendants filed nothing—and the record contains nothing—setting forth facts that differentiate the plaintiff's symptoms from those described in the cases of *Sullivan v. Boston Gas* . . . and *Bresnahan v. McAuliffe*. . . . Thus, while it is a close question, the plaintiff testified to sufficient emotional distress to survive the defendants' motion for summary judgment." *Id.*  Furthermore, as defendant concedes, the *Sullivan* court indicated that evidence that the plaintiffs watched their home burn to the ground might be sufficient, in and of itself, to corroborate the physical manifestations of emotional distress.  414 Mass. at 130, 140.

Despite defendant's argument to the contrary, all of the plaintiffs here testified that they observed the burning of their homes in at least some capacity.  And they all testified that they experienced the type of physical symptoms described in *Sullivan* and *Guiteierrez.*  Although it is certainly true that, like the plaintiff in *Kelly*, plaintiffs' testimony as to these symptoms may have been self-serving and therefore less credible, the jury was entitled to credit it.  Accordingly, defendant's motion for judgment as a matter of law on the emotional distress claims will be denied.

17

**B.**     <u>New Trial as to Liability</u>

       **1.**     <u>Weight of the Evidence</u>

The first ground on which defendant bases its request for a new trial is the contention that the verdict was against the weight of the evidence as to liability.  For the reasons set forth above, the Court finds that a reasonable jury could have found for plaintiffs as to liability and thus "the outcome was not against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice."  *Goulet*, 512 F.3d at 44.  Accordingly, defendant's motion for a new trial as to liability will be denied.

       **2.**     <u>Evidence of Subsequent Remedial Measures</u>

The second ground on which defendant bases its request for a new trial is the admission of evidence concerning the subsequent remedial measure of pulling back the mulch.  Defendant argues that such evidence was admitted to prove negligence in contravention of Fed. R. Evid. 407, which prejudiced the defendant such that a new trial is warranted.

The first such evidence came in the form of testimony of Victoria Jackman, a defense witness, while she was being cross-examined by plaintiffs' counsel.  Ms. Jackman was asked when the decision to pull back the mulch was made, and the Court permitted the question, not immediately understanding that plaintiff was seeking to elicit evidence of subsequent remedial measures.  Jackman then testified that the decision was made shortly after the fire.  The Court then immediately (indeed, without being requested to) gave the following curative instruction to the jury:

> Let me caution the jury.  Obviously everyone is encouraged to make things safer after something has happened, and *you cannot use evidence that something was done after the fact to make something safer as proof it wasn't safe before the incident happened.*  We expect and want everyone to learn from incidents and to

improve things as time goes on.

(Tr. Day 4 at 110-11) (emphasis added).  No objection was made to that instruction, and there was no request for further instruction as to that issue.  No further testimony concerning subsequent remedial measures was elicited from Jackman.

The next witness was Dave Homan.  On direct testimony, defense counsel asked more specifically about why and when he actually ordered the mulch pulled back.  When plaintiffs' counsel attempted to impeach that testimony on cross-examination, defense counsel objected. The Court then ruled in a sidebar conference that defendant had opened the door during direct examination of Homan at least to a limited extent, and permitted the testimony.

During closing argument, defense counsel again mentioned Homan's testimony that it was his idea to pull back the mulch after the fire.  In rebuttal, plaintiffs' counsel referred to the fact that "counsel just brought up that it was more than a week or a week thereabouts that they finally made the decision after the big fire on May 29th to pull the mulch away from the buildings."  (Tr. Day 5 at 29).  Defendant contends that this statement in rebuttal further compounded the prejudice of the original improper admission.

Defendant overstates the effect of this small portion of testimony, and understates its own counsel's role in bringing it before the jury.  Defense counsel admitted that his purpose in eliciting the testimony from Homan was to show that it was defendant's idea, and not the fire department's, to pull back the mulch.[4]  Counsel was certainly permitted to waive the protection

---

[4] Counsel stated at the sidebar conference during Homan's cross-examination related to this issue that "the reason [he] introduced it is because the entire time the suggestion has been that they said pull the mulch back. . . . Simpson's response is after the fire, it was then they said maybe we should pull the mulch back, so that's what that testimony is for, even though it's not germane, it's more rehabilitating my client in the eyes of the jury that they didn't receive that information and ignore it."  (Tr. Day 4 at 138).

of Rule 407 and adopt such a strategy.  Implicit in counsel's decision to pursue that strategy is a determination that the information about the subsequent remedial measure was not particularly prejudicial to his client.  It would be illogical and unfair, with the benefit of hindsight, to permit defendant to use the admission of that evidence to vacate the jury verdict.

It is true that Jackman's testimony about the timing of the decision to pull back the mulch—which preceded Homan's testimony—should not have been elicited.  However, that testimony was limited, and the Court immediately gave a curative instruction.  While that instruction fell perhaps somewhat short of absolute perfection, it was not objected to, and counsel did not request anything further.  If defense counsel had not elicited additional information, the matter would have ended there.  Instead, defense counsel chose to reintroduce the subject.

Under the circumstances, the Court finds that the admission of evidence of subsequent remedial measures does not warrant a new trial.

### 3.    New Theory of Liability

Defendant next contends that it was prejudiced by plaintiffs' reliance on a previously undisclosed theory of liability at trial.  Specifically, defendant contends that in the pre-trial memorandum plaintiffs asserted that their theory of liability was based upon whether or not the landscaping mulch was a dangerous and flammable form of yard waste.  Defendant contends that it relied on that assertion and consequently was prejudiced at trial when the theory of liability actually rested on the defendant's failure to pull the mulch back away from the building.

In the joint pre-trial memorandum, plaintiffs included the following paragraph in their "concise statement of the evidence":

> Plaintiffs will show Simpson at all times was in control of all common areas of
> the premises.  Plaintiffs' evidence will show Simpson knew, after three fires, that
> the bark mulch installed by the landscaping company was highly flammable.
> Plaintiffs expect the evidence to show Simpson failed to monitor the landscaping
> work performed on its property.  Plaintiff's evidence will show Simpson owed a
> duty of care to its tenants to remove any known hazards within its control from
> the premises.  Plaintiffs evidence will show Simpson, as required of all landlords
> in Massachusetts, must keep their premises in a safe condition.  Plaintiffs expect
> the evidence to show Simpson knew that the bark mulch posed an unsafe
> condition.  Plaintiffs expect the evidence to show Simpson failed to correct the
> known safety hazard, highly flammable bark mulch, on the premise[s] after three
> fires occurred within a month of the installation of the bark mulch.  Plaintiff's
> evidence will show Simpson had a reasonable opportunity to correct the hazard
> by removing the mulch.

(Joint Memo. at 2-3).  Defendant contends that the paragraph did not give it adequate notice of

plaintiffs' theory of liability.

The paragraph did not simply allege that the mulch was a defective or inherently

dangerous product; it specifically referred to the prior fires as having put defendant on notice

that the mulch posed a danger at Highlands at Dearborn.  The paragraph also alleged that

defendant failed to reasonably address a dangerous condition, which it allegedly could have done

by "removing the mulch."

At trial, plaintiffs introduced evidence that moving the mulch away from the buildings

would have likewise addressed the dangerous condition.  Moving a known fire risk further away

from a residence and removing it entirely are not totally distinct remedial actions; they are

essentially different degrees of the same action.  Defendant was certainly on notice, and

therefore should have been prepared to defend, the argument that a reasonable landlord would

have moved or removed the mulch.  The likely potential defenses against those allegations—that

the mulch was not dangerous or that leaving it in place was not unreasonable due to feasibility or

cost issues—are essentially identical.  Accordingly, the defendant's motion for a new trial on the

ground that plaintiff's advanced a new and unanticipated theory of liability at trial will be denied.

### 4. <u>Medical Evidence Testimony</u>

Finally, defendant contends that it was prejudiced by the admission of evidence of medical treatment in the form of plaintiffs' own testimony.  Defendant contends that it relied on the Court's pre-trial ruling precluding plaintiffs from introducing any medical evidence because no medical records were produced in discovery.

At trial, plaintiffs did not attempt to introduce medical records.  However, some of the plaintiffs mentioned seeking out treatment from counselors or doctors in response to open-ended questions about how they coped with the effects of the fire during direct examination.  Those statements occurred on three occasions, and each drew an objection.  Gardner testified that she made a telephone to call to a hotline just to talk to somebody; the Court struck any reference to insurance within her answer.  (Tr. Day 3 at 42-43).  Fuliciano testified that she went to see a doctor a few days after the fire because she was having "anxiety attacks;" she also began to say that she was prescribed a medication but was interrupted by an objection, which was sustained, striking any reference to prescription medication.  (Tr. Day 3 at 72-73).  Felteau testified that she went to see a therapist.  (Tr. Day 4 at 33).

Before Gardner had completed her answer, which referred to the hotline she called, defendant objected, citing the Court's ruling on the motion in limine precluding medical evidence.  During a sidebar conference, the Court considered the issue at length, including the reach and import of its earlier ruling.  Plaintiffs' counsel argued that there was no record created and the fact that a person sought treatment, in and of itself, should not be excluded.  The most

relevant portion of the discussion is reproduced below:

THE COURT:            . . . let me ask, first off, what is your understanding of what
                     happened?  What did you request?

MR. HEALY:           As part of discovery, we asked for all documentary
                     evidence to prove that there are medical damages.  As the
                     trial approached, I reached out to Attorney D'Angelo and I
                     indicated those overtures, if you are intending on producing
                     any medical records, please provide them to me.  Those
                     requests for medical records were made prior to this trial.

THE COURT:           Is counseling a medical record?

MR. HEALY:           I would suggest it is.

MR. D'ANGELO:        But my argument is we never had any – there's no reason
                     she can't testify that she sought treatment. . . .

THE COURT:           Here's what I'm going to do, I'm going to allow her to say
                     in substance that she called seeking counseling and that she
                     had some telephone conversations with the counselor
                     without getting into the content of that, and we'll leave it at
                     that.

(Tr. Day 3 at 41-42).  Consistent with that decision, the Court did not strike later statements by

Fuliciano and Felteau that they sought treatment, but did strike Fuliciano's reference to

prescription medication.

The Court's decision was within the scope of its discretion, and was not unfair under the

circumstances.  No damages were sought for the costs of medical treatment and no records were

offered into evidence.  The only statements the Court permitted to remain part of the record were

simple statements of fact—that some plaintiffs sought treatment.  None of those statements

appear to have been disputed, and all appear to have been made by plaintiffs at their depositions.

The content or outcome of the treatment was not in evidence.  Indeed, as the Court noted during

the sidebar conference, evidence that a plaintiff sought treatment, standing alone, is insufficient

to prove a physical manifestation of emotional distress.  Under those circumstances, it is hard to

see how the short statements at issue truly prejudiced the defense.  Accordingly, defendant's

motion for a new trial on the ground that medical evidence was improperly introduced at trial

will be denied.

      **C.**      <u>**Remittitur**</u>

Defendant also seeks an order of remittitur of the emotional distress damages, giving

plaintiffs the option of accepting lower damages awards or going forward with a new trial as to

damages alone.  Defendant contends that the emotional distress damages should be remitted

because they were (1) impermissibly punitive in nature, (2) excessive and against weight of

evidence, and (3) impermissibly based on the loss of pets.

All of the plaintiffs were awarded exactly the same large amount of emotional distress

damages despite their differing testimony as to the effects of the fire on them.  There was no

psychiatric, psychological, or other expert testimony as to the extent of any of the emotional

distress experienced by plaintiffs; all of the evidence came in the form of plaintiff's own, often

emotionally charged, testimony.  No plaintiff claimed permanent physical injury.  No plaintiff

was hospitalized**.**  That is at least some indication that the damages were not grounded in the

evidence, but rather excessive and perhaps punitive.

There was also a significant amount of testimony about the loss of pets.  The Court did

give a limiting instruction informing the jury that pets are considered property under the law of

Massachusetts and therefore emotional distress damages could not be awarded for their loss;

however, considering the content and emotional nature of the testimony, there is at least some

doubt that the jury heeded the instruction.  *Rule v. Fort Dodge Animal Health, Inc.*, 604 F. Supp.

2d 288, 305 (D. Mass. 2009) ("Massachusetts has not extended recovery of damages in tort for emotional distress resulting from an injury to a third party to include persons who suffer the loss of a companion animal.").  The testimony need not be reproduced in full here, but it involved tearful statements likening pets to "babies" and multiple accounts of futilely searching for pets after the fire.

As stated at the outset, a district court is "obligated . . . to grant a remittitur or a new trial on damages only when the award 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" *Eastern Mountain*, 40 F.3d at 502 (internal citations omitted).[5]  "Although determining whether damages for emotional distress are excessive is difficult, such damages are not immune from review." *Koster v. TWA*, 181 F.3d 24, 34 (1st Cir. 1999).[6]  The First Circuit has held that it is appropriate for a district court to take the absence of medical or psychiatric evidence into account in fashioning a remittitur. *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 724 n. 13 (1st Cir. 1994) (affirming a decision to remit the award for emotional distress from $150,000 to $37,500).   Furthermore, "[a]wards in comparable cases are instructive." *Aponte-Rivera v. DHL Solutions (USA), Inc.*, 650 F.3d 803, 811 (1st Cir. 2011).

Courts have ordered remittiturs in a number of cases where emotional distress damages were awarded.  Other than *Sanchez*, defendant cites to two other cases where the damages award

---

[5] The Court notes that "federal law governs the question of whether the trial court should order a remittitur in a diversity case." *Blinzler v. Marriott Int'l*, 81 F.3d 1148, 1161 (1st Cir. 1996) ?(citing *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649 (1977)).

[6] Because it is extremely difficult, if not impossible, to discern whether the jury's awards were based on improper motivations, such as punishing defendant or compensating plaintiffs for emotional distress caused by their loss of pets, the Court will focus this inquiry on whether or not the awards of $450,000 were supported by the evidence.

was found to be excessive in light of an absence or dearth of medical or psychiatric evidence. *See Soto-Lebron v. Fed. Express Corp.*, 538 F.3d 45, 69 (1st Cir. 2008) (finding a $1,800,000 emotional distress award to be "shockingly exorbitant" and ordering a new trial where the "evidence did not include any expert psychological testimony and did not come close to establishing that he was disabled by his emotional injury"); *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 823-26 (remanding for remittitur a grossly excessive $550,000 emotional distress award where the plaintiff suffered from depression and sought counseling but had not been hospitalized or taken medicine). Other cases are to the same effect. *See, e.g., Subatch v. Harvey*, 1985 U.S. Dist. LEXIS 13249 (D. Mass. 1985) (finding that $250,000 for emotional distress when there was, among other things, no evidence of medical expenses was "so extravagant an amount as to be unjust" and therefore reducing the award to $75,000).

Here, the jury awarded emotional distress damages of $450,000 per plaintiff, notwithstanding the absence of evidence of medical or psychiatric diagnoses or expenses. After a careful review of the record and a compendium of analogous cases, the Court concludes that the awards for emotional distress damages in this case were excessive and not supported by the weight of the evidence. In most of the cases reviewed in the course of making this determination similarly excessive damages awards were remitted by $150,000 to $800,000. *See, e.g., Trainor v. HEI Hospitality, LLC*, 699 F.3d 19, 32 (1st Cir. 2012) (originally remitted from $1,000,000 to $500,000, remanded by First Circuit for remittitur to $200,000); *Aponte-Rivera v. DHL Solutions (USA), Inc.*, 650 F.3d 803, 811 (1st Cir. 2011) (affirming a remittitur from $350,000 to $200,000); *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 18 (1st Cir. 2005) (awards to parents of injured victim remit by First Circuit from $500,000 each to $100,000 each); *Koster*, 181 F.3d at

35-36 (remit by First Circuit from $716,000 to $250,000).

Accordingly, the Court will order a new trial on the sole issue of emotional distress damages unless plaintiffs agree to accept remitted emotional distress damages of $100,000 each.

## V.     Conclusion

For the foregoing reasons, defendant's motion for judgment as a matter of law, or, in the alternative, for a new trial as to liability will be DENIED.  Defendant's motion for a new trial or remittitur as to emotional distress damages will be GRANTED; plaintiffs shall inform the court by August 29, 2013, whether they seek a new trial.  If not, judgment shall enter in the amount of $100,000 in emotional distress damages as to each plaintiff, plus their already determined damages as to loss of property and pre-judgment interest.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: August 9, 2013