# EXHIBIT C

| Qty | Description | $ | Total | Age |
|---|---|---|---|---|
| **OFFICE** | | | | |
| 20 | Books Guitar Music Books | 5 | 100 | 8 years |
| 100 | Books Reference to Fiction | 20 | 2000 | Various |
| 1 | Cat Supplies 40 lbs of Scoop Away Cat Litter | 20 | 20 | new |
| 1 | Cat Supplies Fleece Cat Bed & Cover | 30 | 30 | new |
| 1 | Cat Supplies Hooded Cat Box, Omega | 35 | 35 | 1 year |
| 1 | Cat Supplies Kitty Sack (Toy) | 20 | 20 | new |
| 1 | Cat Supplies Pet Taxi | 45 | 45 | 1 year |
| 1 | Cat Supplies Tub of Catnip | 12 | 12 | new |
| 1 | Cat Supplies Window Cat Perch | 30 | 30 | new |
| 1 | Clothing Down Full Length Coat Calvin Klein | 120 | 120 | 8 months |
| 1 | Clothing Down Jacket Calvin Klein | 90 | 90 | 8 months |
| 1 | Clothing Gloves, Hats, Scarves, Mittens | 80 | 80 | 2 years |
| 1 | Clothing Rain Coat/Windbreaker, London Fog | 100 | 100 | 2 years |
| 1 | Clothing Ski Jacket Columbia | 210 | 210 | 4 months |
| 1 | Clothing Ski Pants | 20 | 20 | 4 months |
| 1 | Clothing Winter Boots Puffins | 80 | 80 | 1 year |
| 1 | Computer CDR's, 100 pack | 85 | 85 | new |
| 1 | Computer CPU | 600 | 600 | 6 years |
| 1 | Computer Ergo Keyboard | 35 | 35 | 1 year |
| 1 | Computer Flat Screen Monitor | 200 | 200 | 4 years |
| 1 | Computer HP Printer | 200 | 200 | 1 year |
| 1 | Computer Monitor Glare Shade | 65 | 65 | 1 year |
| 1 | Computer Rollerball Mouse Wireless | 30 | 30 | 1 year |
| 1 | Computer Scanner/Fax | 200 | 200 | 4 years |
| 30 | Crafting Card Stock, Various Colors | 12 | 360 | Various |
| 300 | Crafting Hand Made Cards | 5 | 1500 | new |
| 100 | Crafting Ink for Stamps | 6 | 600 | Various |
| 1 | Crafting Markers, Chalk, Color Pencils, Ink, Rollers, Embossers, Pads, Cleaners, etc. | 2000 | 2000 | 6 months |
| 1 | Crafting Paper Cutter | 21 | 21 | 1 year |
| 30 | Crafting Ribbon, Various | 5 | 150 | 6 months |
| 12 | Crafting Specialty Scissors | 8 | 96 | 1 year |
| 1 | Crafting Stamping Supplies Cabinet | 250 | 250 | 1 year |
| 200 | Crafting Stamps | 8.5 | 1700 | 1 year |
| 1 | Décor 4x6 Rug in entranceway | 55 | 55 | 6 months |
| 1 | Décor African Tribal Mask Collectors | 180 | 180 | 15 years |

| Qty | Item | Value | Total | Age/Note |
|---|---|---|---|---|
| 1 | Décor African Tribal Masks Decorative | 15 | 15 | 15 years |
| 4 | Décor Puerto Rican Door Plaques | 20 | 80 | 2 years |
| **TOTAL OFFICE** | | | **12461** | |
| 8 | Games Life, Battle of the Sexes, Trivial Pursuit, Jenga, Win Lose or Draw, Pictionary, Yahtzee, Scrabble | 25 | 200 | Various |
| 1 | Office Supplies Address Book with 37 years of Address/Job/Personal History | 60 | 60 | 37 years |
| 1 | Office Supplies Box of Checks, New | 30 | 30 | new |
| 1 | Office Supplies Desk Chair | 250 | 250 | 1 year |
| 1 | Office Supplies Shredder | 30 | 30 | 1 year |
| 1 | Office Supplies Postage Stamps | 42 | 42 | 2 months |
| 1 | Office Supplies Stapler, tape, Shipping Envelopes, Pens, Adding Machine, Scissors, Pliers etc | 385 | 385 | 2 years |
| 1 | Office Supplies Trash Can | 40 | 40 | 8 months |
| 1 | Umbrella | 10 | 10 | |
| **PATIO/STORAGE** | | | | |
| 1 | Camping Cooler Igloo 60Qt | | | |
| 1 | Camping Equipment Coleman 6 Person Tent | 46 | 46 | 2 years |
| 1 | Camping Equipment Coleman Air Mattresses, Lantern, Hatchet, Plastic Dishes, Table Cloth, Cooking Set with Pots Pans Dishes and Utensils, Water Jug, Thermos, Picnic Basket, Skewers, Ponchos, Heater, | 250 | 250 | |
| 1 | Camping Chairs, etc | 400 | 400 | |
| 1 | Camping Equipment Coleman Camp Stove | 50 | 50 | |
| 1 | Camping Equipment Coleman Screen Tent | 50 | 50 | 5 years |
| 2 | Camping Equipment Coleman Sleeping Bags | 45 | 90 | |
| 1 | Camping Hammock Rope | 30 | 30 | |
| 1 | Car Care Supplies Chamois, Wheel Cleaner, Armor All, Scratch Remover, Bug & Tar Remover, Wash Mit, | | | |
| 1 | Tire Wet, Leather Cleaner, Maguire's Car Wash etc | 100 | 100 | |
| 1 | Décor Christmas Ornaments & Holiday Décor, 37 years of personal mementos including Snow Babies, | | | |
| 1 | Lenox Santa and many Hand Made Ornaments from my Grandmother, now deceased | | | |
| 1 | Décor Holiday - Easter and Halloween, hand painted statues, wall décor, hand made Easter Basket (34 years old), hand made eggs, etc. | 1000 | 1000 | |
| 1 | Furniture Solid Wood L Rm Set w/ Sofa Table, Coffee & 2 End tables | 1800 | 1800 | 10 years |
| 2 | Garden Dirt, 4 cubic feet organic | 30 | 60 | 1 week |
| 40 | Garden Plant Pots | 15 | 600 | Various |
| 1 | Garden Plants - Herb Garden, Vegetables, Lettuces, etc. | 91 | 91 | 1 week |
| 1 | Garden Plants and Flowers | 300 | 300 | 35 years |
| 6 | Garden Trowel, hoe, shovel, gloves, etc. | 6 | 36 | Various |
| 1 | Garden Watering Can | 6 | 6 | |

| Qty | Description | | | |
|---|---|---|---|---|
| 1 | Grill Cleaner, Tongs, Skewers, Liners | 30 | 30 | 30 |
| 1 | Grill MECO Electric Grill | 220 | 220 | 1 year |
| 2 | Tools Antifreeze (Gallon) | 7 | 14 | |
| 1 | Tools Black and Decker 18V Drill, Bits | 68 | 136 | 18 months |
| 1 | Tools Craftsman 3pc adjustable wrench set | 30 | 30 | 3 years |
| 1 | Tools Craftsman 3pc pliers set | 40 | 40 | 2 years |
| 1 | Tools Craftsman 8pc Ratchet Set | 60 | 60 | 4 years |
| 1 | Tools Craftsman Screwdriver Set | 90 | 90 | 2 years |
| 1 | Tools Craftsman Tool Chest/Cabinet 10 Drawer | 300 | 300 | 2 years |
| 1 | Tools Hammer, Nails, Screws, Nuts, Bolts, Hangers, Clips, Picture Hangers, Wire, Plumber's Tape, Duct Tape, Electrical Tape, Tin Snips, Eyeglass Repair Kit, Miscellanous Screwdrivers, Hammers, Anchor sets, Stud Finder, Lazer Level, Paint, Varnish, Paint Brushes, Sponge Brushes, Painters Tape, Pipe Wrench, Pry Bar, Needlenose Pliers, Razor Blades, Box Knives, Hand Sander, Box Sander, Cordless Drill, Router, Hand Saw, Coping Saw, Files, Rubber Mallet, Paint Remover, Auto Body Compound, Polishing Compound, Rags, Gallons of Cleaner (Windex, Clorox Cleanup, etc) | 1000 | 1000 | 1000 Various |
| 1 | Tools Maglight | 25 | 25 | |
| 1 | Tools Oil Drip Pan, Funnel, Filter, Filter Wrench | 40 | 40 | 1 year |
| 6 | Tools Quarts of Synthetic Mobil 1 Oil | 8 | 48 | |
| 2 | Tools Standard and Hex Key Sets | 20 | 40 Various | |
| | TOTAL PATIO &/OR STORAGE | | 7082 | |
| | KITCHEN | | | |
| 1 | Appliances Blender Oster | 35 | 35 | |
| 1 | Appliances Crock Pot Rival 5 Qt | 35 | 35 | 2 years |
| 1 | Appliances Cuisinart Food Processor | 140 | 140 | 4 months |
| 1 | Appliances Espresso Machine | 300 | 300 | 4 months |
| 1 | Appliances Fry Daddie | 30 | 30 | 2 Years |
| 1 | Appliances George Foreman Grill | 50 | 50 | 4 years |
| 1 | Appliances Ice Cream Maker Rival | 35 | 35 | |
| 1 | Appliances IKEA Undercounter Lights | 25 | 25 | 1 year |
| 1 | Appliances Mixer Kitchenaid Pro | 250 | 250 | 6 months |
| 1 | Appliances Toaster | 35 | 35 | |
| 1 | Appliances Turkey Roaster | 50 | 50 | 3 years |
| 1 | Bar Supplies Corner Cabinet Wooden Bar | 350 | 350 | 6 years |
| 11 | Cat Grooming | 15 | 165 Various | |
| 1 | Cat Toys | 15 | 15 Various | |

| Qty | Category | Description | | | |
|---|---|---|---|---|---|
| 1 | Cat Treats | | 5 | 5 | Various |
| 1 | Cookware | Angel Food Pan | 8 | 8 | 5 years |
| 1 | Cookware | Baking Dishes Calphalon | 150 | 150 | |
| 1 | Cookware | Carving Knife and Fork Henckel | 240 | 240 | 3 years |
| 1 | Cookware | Casserole Dishes Set of 4 Corning Ware | 85 | 85 | 2 Years |
| 3 | Cookware | Cheesecake Springform Pans | 30 | 90 | 5 years |
| 1 | Cookware | Cheesecloth | 2 | 2 | 5 years |
| 1 | Cookware | Colander | 12 | 12 | |
| 12 | Cookware | Cook Books | 10 | 120 | Various |
| 1 | Cookware | Cookie Sheets | 30 | 30 | Various |
| 3 | Cookware | Cooling Racks | 25 | 25 | 5 years |
| 1 | Cookware | Cutting Board One Butcher Block, one bamboo, one plastic | 40 | 120 | Various |
| 3 | Cookware | Garde Manger Tools | 200 | 200 | Various |
| 1 | Cookware | Glass/Stainless Storage Containers/Mixing Bowls | 90 | 90 | Various |
| 1 | Cookware | Knife Set Henckels Twin Cuisine | 350 | 350 | 1 year |
| 1 | Cookware | Measuring Cups/Spoons Pampered Chef | 30 | 30 | 5 years |
| 1 | Cookware | Oven Mitt | 15 | 15 | 2 Years |
| 1 | Cookware | Pastry Roller/Blender | 8 | 8 | 5 years |
| 1 | Cookware | Pizza Stone Pampered Chef | 25 | 25 | 4 years |
| 1 | Cookware | Pots & Pans Calphalon Set | 250 | 250 | 6 months |
| 1 | Cookware | Recipes | 75 | 75 | Various |
| 1 | Cookware | Rolling Pin | 15 | 15 | 5 years |
| 1 | Cookware | Salt/Pepper Grinders | 50 | 50 | 1 year |
| 1 | Cookware | Tupperware/Plastic Ware | 38 | 38 | Various |
| 1 | Cookware | Utensils Cork Screw & Misc | 65 | 65 | Various |
| 1 | Cookware | Utensils Garlic Press & Slicer | 25 | 25 | Various |
| 1 | Cookware | Utensils Meat Tenderizer | 15 | 15 | Various |
| 1 | Cookware | Utensils Spatulas, Can Opener, Rubber Spatulas, Kitchen Scissors, Basting Brush, Veg Peeler, Apple Peeler Corer Slicer (Pampered Chef) Ice Cream Scoop, Cookie Scoops, Handy Chopper (Pampered Chef) | 150 | 150 | Various |
| 1 | Cookware | Utensils Steak Knives | 60 | 60 | Various |
| 1 | Cookware | Utensils Tongs | 25 | 25 | Various |
| 1 | Cookware | Various Spices | 160 | 160 | Various |
| 1 | Cookware | Iced Tea Pot by Mr. Coffee (1 Gallon) | 35 | 35 | 1 year |
| 1 | Décor | Kitchen Rugs | 150 | 150 | 4 months |
| 1 | Décor | Plant & Wrought Iron Stand | 50 | 50 | 8 year |
| 1 | Décor | Trash Can Cuisinart | 98 | 98 | 8 months |

| Qty | Item | Value | Total | Note |
|---|---|---|---|---|
| 1 | Dishes Coffee Mugs (12) | 20 | 20 | |
| 36 | Dishes Fiestaware Bowls, Plates, Salad Plates | 9 | 324 | |
| 1 | Dishes Glasses (24) 8 Hi Ball, 8 Iced Tea, 8 Mid Sized | 20 | 20 | |
| 1 | Dishes Martini Glasses (8) | 30 | 30 | 6 months |
| 1 | Dishes Serving Dishes | 50 | 50 | |
| 1 | Dishes Wine Glasses (12) | 15 | 15 | |
| 1 | Food Non Perishable Foods | 400 | 400 | Various |
| 1 | Food Perishable Foods | 600 | 600 | new |
| 1 | Household Cleaning Supplies | 150 | 150 | Various |
| 1 | Liquor Absolut Citron | 30 | 30 | New |
| 1 | Liquor Alize | 15 | 15 | New |
| 1 | Liquor Chambord | 36 | 36 | New |
| 1 | Liquor Champagne Vueve de Cliquo | 80 | 80 | New |
| 1 | Liquor Ice Wine (Canadian) | 150 | 150 | New |
| 1 | Liquor Jack Daniels | 38 | 38 | New |
| 1 | Liquor Triple Sec | 12 | 12 | New |
| 7 | Liquor Various Reds | 45 | 315 | 4 months |
| 2 | Silverware Oneida | 25 | 50 | |
| 1 | Silverware Set of Silver Grandma's | 500 | 500 | Antique |
| **TOTAL KITCHEN** | | | **7216** | |
| | **BEDROOM** | | | |
| 1 | Accessories Beach Bag | 15 | 15 | 1 year |
| 8 | Accessories Leather Belts | 15 | 120 | various |
| 3 | Accessories Leather Purses | 60 | 180 | various |
| 2 | Accessories Leather Wallets | 15 | 30 | various |
| 1 | Appliance Ceiling Fan Hunter Douglass | 150 | 150 | 2 years |
| 1 | Appliance Digital Camera Sony | 250 | 250 | 4 years |
| 1 | Appliance Digital Picture Frame | 70 | 70 | 5 months |
| 1 | Appliance DVD Player Cobia Portable | 50 | 50 | 6 months |
| 2 | Appliance DVD Players | 150 | 300 | 6 months |
| 1 | Appliance iPod | 250 | 250 | 3 months |
| 1 | Appliance iPod Case | 20 | 20 | 3 months |
| 1 | Appliance iPod Speakers | 100 | 100 | 3 months |
| 4 | Appliance Personal | 50 | 200 | 1-3 years |
| 1 | Appliance Sewing Machine Singer | 300 | 300 | 5 years |
| 1 | Appliance TV 36" Sony | 900 | 900 | 5 years |

| Qty | Item | | | |
|---|---|---|---|---|
| 1 | Appliance Window Fan Holmes | 30 | 30 | 2 weeks |
| 2 | Appliances Cingular Phone Charger | 20 | 40 | 1 year |
| 1 | Appliances Heating Pad | 25 | 25 | NEW |
| 4 | Bath Beach Towels | 10 | 40 | 2 years |
| 6 | Bedding Blankets | 35 | 210 | various |
| 1 | Bedding Comforter King Size Goose Down Aurora | 180 | 180 | 6 months |
| 2 | Bedding Pillows Firm Queen | 8 | 16 | 5 months |
| 2 | Bedding Pillows Latex Sleepy's | 125 | 250 | 5 months |
| 3 | Bedding Sheet Sets 800 TC White Stripe | 69 | 207 | 5 months |
| 1 | Bedding St. Mary's Quilters Handmade Wedding Quilt Queen Size | 300 | 300 | 10 years |
| 12 | Books/Journals | 25 | 300 | various |
| 1 | Clothing Bathing Suit Newport News | 47 | 47 | 1 week |
| 8 | Clothing Bras Victoria's Secret | 40 | 320 | various |
| 15 | Clothing Business Suits | 120 | 1800 | various |
| 50 | Clothing Shirts | 30 | 1500 | various |
| 1 | Clothing Hermes Scarf, Hand Made Coupons Indiens | 375 | 375 | 6 months |
| 10 | Clothing Intimate Apparel | 35 | 350 | various |
| 1 | Clothing Jeans Levis Curvy | 78 | 78 | 5 months |
| 1 | Clothing Jeans Lucky Brand | 110 | 110 | 1 year |
| 30 | Clothing Panties Victoria's Secret | 10 | 300 | various |
| 12 | Clothing Pants Dress for Work | 30 | 360 | various |
| 15 | Clothing Pantyhose/Knee/Thigh Hi | 10 | 150 | 6 months |
| 15 | Clothing Scarves | 20 | 300 | various |
| 30 | Clothing Shoes Clarks (20 pair), Reeboks, Soft Clogs (3 pair), Naturalizers (6 pair) | 100 | 3000 | less |
| 1 | Clothing Slippers | 10 | 10 | various |
| 25 | Clothing Socks Black | 8 | 200 | various |
| 10 | Clothing Socks White | 8 | 80 | various |
| 6 | Clothing Sweaters | 30 | 180 | various |
| 4 | Clothing Sweatshirts | 20 | 80 | various |
| 25 | Clothing Tshirts | 15 | 375 | various |
| 12 | Clothing Work Out Clothes, Shorts, Pants, Sports Bras | 20 | 240 | various |
| 1 | Computer Laptop HP Pavilion dv9700 Notebook PC with AMD Turioun 64 X2 Mobile Technology, 2.10 GHz, 3.00GB, 32 bit Operating System | 850 | 850 | 8 years or 2 years or less |
| 1 | Computer Laptop Numerical Keypad Targus | 15 | 15 | 7 months |
| 1 | Computer Laptop Wireless Mouse Logitech | 20 | 20 | 7 months |
| 1 | Craft Supplies - Yarn, Knitting Needles, Crochet Hooks, Craft Notions | 200 | 200 | various |

| Qty | Description | | | |
|---|---|---|---|---|
| 1 | Décor Beaded Leather Set Memento Box and Picture Frame | 200 | 200 | 2 years |
| 1 | Décor Candle Holder Blue Apothecary Glass | 50 | 50 | 10 years |
| 4 | Décor Drapes/Curtains Purple, Beige, Blue, Green | 60 | 240 | various |
| 4 | Décor Drapery Rods (One set on wall, three sets in closet) | 35 | 140 | various |
| 1 | Décor Misc Pictures and Mirrors | 300 | 300 | various |
| 100 | Décor Picture Frames | 30 | 3000 | various |
| 6 | Décor Rugs Hand Loomed, Irreplaceable | 1000 | 6000 | various |
| 2 | Décor Wall Art Set | 50 | 100 | 8 months |
| 1 | Décor Winnie the Pooh, 34 Years old, Irreplaceable | 100 | 100 | 34 years |
| 6 | Devor Wooden Molding Style Shelving | 35 | 210 | 10 years |
| 1 | Eyeware BioMetrix Contacts | 36 | 36 | brand new |
| 1 | Eyeware Rx Sunglasses | 110 | 110 | 3 years |
| 3 | Eyeware Sunglasses | 10 | 30 | 2 weeks |
| 2 | Furniture Lamps (Bedside) Target | 15 | 30 | 2 years |
| 2 | Furniture Lamps (Cocktail) JCPenney | 80 | 160 | 5 months |
| 1 | Furniture Pier 1 Queen Size Headboard & Footboard, Side Rails, (2) Bedside Tables, Mirror & Dresser | 3000 | 3000 | 6 years |
| 1 | Furniture Stearns and Foster Queen Plaza Collection Louis XV Ultra Plush Euro Top Mattress and Box Spring | 2200 | 2200 | 5 months |
| 1 | Laptop Case/Travel Bag Brookstone | 120 | 120 | 1 week |
| 1 | Luggage 2 piece Wilson's | 310 | 310 | 1 week |
| 2 | Luggage Travel Neck Pillows | 12 | 24 | 2 weeks |
| 1 | Memento Cross Pen and Pencil Grandfather's Retirement Gift after 50 years of Service with IBM, engraved 14k gold set | 200 | 200 | 15 years |
| 2 | Mementos Grandfather's Wallets - both leather, one embossed with horse and horseshoe, irreplaceable | 40 | 80 | 30 years |
| 1 | Mementos Log Cabin made by my grandfather of sticks he collected and cut down.  With removable roof (jewelry box style) and chimney.  Two people cut from wood, hand painted | 100 | 100 | 80 years |
| 8 | Mementos Scrap Books - 30 year collection of letters with my Great Grandmother, Grandmother and Aunt. | 20 | 160 | 37 years |
| 100 | years of photos.  Awards, ribbons, 20 years of writing, baby pictures. | 20 | 200 | 15 years |
| 300 | Music/Entertainment CDs | 15 | 4500 | various |
| 10 | Music/Entertainment DVDs | 15 | 150 | various |
| 1 | Music/Entertainment Guitar Ovation Acoustic/Electric | 800 | 800 | 12 years |
| 1 | Music/Entertainment Guitar Ovation Hardside Case | 200 | 200 | 12 years |
| 1 | Music/Entertainment Guitar Supplies Picks, Amp, Cords, Capo, Strap, Music Stand | 120 | 120 | 12 years |
| 1 | Music/Entertainment Guitar Tuner | 50 | 50 | 20 years |
| 6 | Rubbermaid Storage Bins, 36Qt | 20 | 120 | |
| 1 | Sporting Goods Packer Favre Jersey | 60 | 60 | 5 years |
| 1 | Sporting Goods Soccer Cleats | 40 | 40 | 2 years |

| Qty | Category | Description | | | |
|---|---|---|---|---|---|
| 2 | Sporting Goods | Soccer Goalie Jerseys | 40 | 80 | 2 year |
| 1 | Sporting Goods | Soccer Shingards | 15 | 15 | 2 year |
| 1 | Sporting Goods | Yoga Equipment Balance Ball, Stretch Rods, Yoga Mat, DVD | 100 | 100 | various |
| 1 | Kitty, 2 years old, Baxter, fixed, declawed, shots | | 500 | 500 | 2 years |
| **TOTAL BEDROOM** | | | | **39108** | |
| | | | | | |
| **HALL CLOSET** | | | | | |
| 1 | Appliances | Face Steamer Conair | 20 | 20 | 1 year |
| 1 | Appliances | Hand Vacuum Dirt Devil | 40 | 40 | 1 year |
| 1 | Appliances | Holmes Humidifier | 60 | 60 | 1 year |
| 1 | Appliances | Homedics Foot Massager | 35 | 35 | 1 year |
| 1 | Appliances | Parafin Wax Hand Treatment Machine | 35 | 35 | 1 year |
| 1 | Bath | Macy's Hotel Collection Optic White 6 Bath Sheets, 4 Hand Towels, 6 Wash Cloths, 2 Tub Mats | 410 | 410 | 1 week |
| 1 | Cat Supplies 20# Cat Food Iams | | 26 | 26 | brand new |
| 1 | HBA | Benadryl Allergy | 8 | 8 | new |
| 1 | HBA | Conditioner Pantene | 8 | 8 | new |
| 3 | HBA | Dial Shower Gel Soap | 6 | 18 | new |
| 1 | HBA | First Aid Kit | 25 | 25 | brand new |
| 1 | HBA | Gold Bond Lotion | 10 | 10 | brand new |
| 1 | HBA | Ibuprofin 1000 ct | 15 | 15 | new |
| 1 | HBA | Migraine Pills 500 ct | 12 | 12 | new |
| 1 | HBA | Neosporin | 6 | 6 | new |
| 2 | HBA | Pepto Bismo, Tums | 6 | 12 | new |
| 2 | HBA | Shampoo Pantene | 8 | 16 | new |
| 3 | HBA | Shaving Gel | 3 | 9 | new |
| 6 | Kitchen | Dishtowels | 8 | 48 | various |
| 6 | Kitchen | Handtowels | 8 | 48 | various |
| 1 | Night Light | | 12 | 12 | 6 months |
| 1 | Shoe Shine Kit Kiwi | | 25 | 25 | various |
| **TOTAL HALL CLOSET** | | | | **898** | |
| | | | | | |
| **BATHROOM** | | | | | |
| 1 | Appliances | Bathroom Scale Digital | 56 | 56 | 6 months |
| 2 | Appliances | Curling Iron (one 1" one 2") | 15 | 30 | |
| 1 | Appliances | Digital Thermometer | 12 | 12 | 6 months |
| 1 | Appliances | Electric Toothbrush Oral B | 69 | 69 | 2 years |

| Qty | Description | | | |
|---|---|---|---|---|
| 1 | Appliances Hair Dryer Conair | 45 | 45 | 45 4 years |
| 1 | Appliances Iron Shark | 35 | 35 | 35 1 year |
| 1 | Bath Shower Head | 45 | 45 | 45 1 year |
| 1 | Bath Shower Organizer | 28 | 28 | 28 6 months |
| 1 | Bath Under Sink Organizer | 35 | 35 | 35 6 months |
| 2 | Décor Bathroom Rugs | 26 | 52 | 52 6 months |
| 2 | Décor Change Bowl Hand Carved Wood | 150 | 150 | 150 5 years |
| 1 | Décor Jewelry Box | 50 | 50 | 50 2 years |
| 1 | Décor Shower Curtain/Liner/WasteBasket/Toothbrush Holder/Cup | 80 | 80 | 80 1 year |
| 1 | HBA Clinique Makeup Moisturizer | 27 | 27 | 27 1 week |
| 1 | HBA Conditioner Trader Joes Lavendar | 7 | 7 | 7 1 month |
| 2 | HBA Detox Skin Gel Eva's Esthetics | 26 | 52 | 52 1 month |
| 1 | HBA Feminine Supplies Kotex Pads and Tampons | 30 | 30 | 30 new |
| 1 | HBA Gel Rockstar | 30 | 30 | 30 new |
| 1 | HBA Hair Brush Revlon | 8 | 8 | 8 new |
| 1 | HBA Lancome Makeup Eye Shadow | 36 | 36 | 36 1 week |
| 1 | HBA Lancome Makeup Foundation | 37 | 37 | 37 1 week |
| 1 | HBA Lancome Makeup Mascara | 18 | 18 | 18 1 week |
| 1 | HBA Makeup Case | 35 | 35 | 35 4 years |
| 1 | HBA Misc OTC Meds | 350 | 350 | 350 various |
| 1 | HBA Paste Alley Cat | 30 | 30 | 30 new |
| 1 | HBA Prescriptions Three Months, 2 Rx | 110 | 110 | 110 new |
| 2 | HBA Shampoo Aveda | 15 | 30 | 30 1 month |
| 1 | HBA TP Charmin Strong 36 pack | 13 | 13 | 13 unopened |
| 20 | Jewelry Costume Necklaces | 20 | 400 | 400 various |
| 1 | Jewelry Fossil Watch | 90 | 90 | 90 2 years |
| 1 | Jewelry Hugs & Kisses Bracelet and Necklace | 400 | 400 | 400 3 years |
| 1 | Jewelry Indian Bracelet | 20 | 20 | 20 2 years |
| 1 | Jewelry Mom's Wedding Ring | 3000 | 3000 | 3000 40 years |
| 1 | Laundry Bamboo Hamper | 30 | 30 | 30 6 months |
| 1 | Laundry Ironing Board Over the Door | 18 | 18 | 18 1 year |
| 1 | Shower Poof | 5 | 5 | 5 |
| 1 | Toilet Brush Set | 15 | 15 | 15 1 year |
| 1 | Vitamin D | 8 | 8 | 8 new |
| 1 | Vitamins Calcium | 14 | 14 | 14 new |
| 1 | Vitamins Psyllium Husk | 25 | 25 | 25 new |
| 1 | Vitamins Women's Daily Vitamin | 15 | 15 | 15 new |

| Item | | |
|---|---|---|
| TOTAL BATHROOM | | 5540 |
| LAUNDRY | | |
| 2 Lingerie Bags | 5 | 10 |
| 12 Delicates Hooks | 2 | 24 |
| 1 200 oz Tide | 18 | 18 |
| 1 Bounce | 12 | 12 |
| 1 Downy | 12 | 12 |
| 200 Hangers | 1 | 200 |
| 1 Bleach Clorox | 3 | 3 |
| 1 Arm & Hammer Baking Soda | 6 | 6 |
| 1 Shout | 8 | 8 |
| 1 Mop | 13 | 13 |
| 1 Broom | 13 | 13 |
| 1 DustPan | 5 | 5 |
| 1 Swiffer & Refills | 26 | 26 |
| 1 Step Stool | 29 | 29 |
| TOTAL LAUNDRY | | 379 |
| LIVING/DINING ROOM | | |
| 1 Appliance Panasonic DVD Player | 50 | 50 |
| 1 Cat Supplies Three Tier Cat Tree | 250 | 250 |
| 2 Décor Art Set | 50 | 100 |
| 1 Décor Candle Set, 3 Cobalt Glass Holders | 50 | 50 |
| 1 Décor Lantern Cobalt Blue | 35 | 35 |
| 1 Décor Cacti Garden, Large | 100 | 100 |
| 1 Décor Enamel Metal Artwork | 79 | 79 |
| 2 Décor Living Room Lamps | 100 | 200 |
| 1 Décor Plant Stand with 3 Potted Plants | 100 | 100 |
| 1 Décor Wall Mirror | 50 | 50 |
| 2 Décor Wrought Iron Stands | 15 | 30 |
| 20 Music/Entertainment DVDs, Assorted | 20 | 400 |
| LIVING ROOM/DINING ROOM TOTAL | | 1444 |
| CONTENT TOTAL | | 74128 |

# Exhibit B

# COGAVIN AND WAYSTACK

### ATTORNEYS AT LAW
### ONE CENTER PLAZA
### BOSTON, MASSACHUSETTS 02108

TELEPHONE (617) 742-3340

FACSIMILE (617) 723-7563

LAWRENCE H. BEHRENS *
AUDREY L. BRADLEY
GERARD A. BUTLER
KATHLEEN M. HANSBERRY
ROBERT W. HEALY †
KATHERINE A. KIRBY
DANIEL S. McINNIS
EDWARD W. WAYSTACK

* ALSO ADMITTED IN VT
† ALSO ADMITTED IN NH

OF COUNSEL

JAMES B. DOLAN
JOHN P. FITZGERALD
GEORGE F. PARKER, III

April 22, 2009

**BY FACSIMILE AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Stephen L. D'Angelo, Esq.
D'Angelo & Hashem, LLC
6 Beacon Street, Suite 505
Boston, Massachusetts 02108

Re:     Gayle Gardner, Unit 807

### RESPONSE TO WRITTEN DEMAND
### FOR RELIEF UNDER G.L. c. 93A

Dear Mr. D'Angelo:

Please be advised that the law firm of Holland & Knight LLP represents Simpson Financing Limited Partnership ("Simpson FLP"), Simpson Housing LLLP ("Simpson"), SHLP Holdings LLLP ("SHLP"), QRS Financing, LLC ("QRS"), Colomba LLC ("Colomba"), and Paloma, LLC ("Paloma") (collectively, the "Simpson Entities") in connection with the fire that occurred on or about May 29, 2008 at the apartment complex known as *Highlands at Dearborn* in Peabody, Massachusetts (the "Dearborn Complex"). Please be further advised that the law firm of Cogavin & Waystack has been appointed by Interstate Fire and Casualty Company, the general liability carrier for the Dearborn Complex. Your letter, dated March 24, 2009, demanding relief from the Simpson Entities pursuant to Massachusetts General laws c. 93A has been forwarded to me and Damon M. Seligson of Holland & Knight LLP for response.

04/22/2009 WED 15:07   FAX 617 723 7563 COGAVIN & WAYSTACK   ☑003/007

Stephen L. D'Angelo, Esq.
Page 2
April 22, 2009

This letter will serve to respond to the claims set forth in your letter. The Simpson Entities, individually and collectively, do not intend, by failing to rebut any specific allegation in your letter, to concede the truth of the same.

At the outset, we do not believe that your letter constitutes a sufficient demand for relief pursuant to the provisions of G.L. c. 93A, § 9. First, your letter speaks in terms of generalities, and provides an inadequate basis upon which any of the Simpson Entities can objectively evaluate the claims which you are trying to make, and formulate an offer of relief. We note that your letter refers to various of the Simpson Entities either being "controlled by", or interrelated to, other Simpson Entities, and improperly reaches the broad conclusion that all are somehow liable to your client as a result of an accidental fire. To clarify, prior to August 17, 2007, Simpson FLP did not own the Dearborn Complex. QRS is the sole general partner of Simpson FLP and Simpson is the sole manager and member of QRS. Colomba is the sole general partner of Simpson. SHLP is a fifty percent (50%) member of Colomba. Paloma is the sole general partner of SHLP. Accordingly, the Simpson Entities are separate and distinct entities. What your letter lacks, however, are specifics as to your client's claims against each of the Simpson Entities.

Second, the conduct which you describe, even if you are able to prove that it took place, does not amount to an "unfair and deceptive practice" as that phrase is used under Massachusetts law. In order for Chapter 93A to apply, there needs to be a substantial and material breach of the implied warranty habitability that was caused by the landlord's negligence or a failure to comply with existing statutes, rules, regulations or laws meant for the protection of the consumers of this Commonwealth. See Cruz Mgt. Co. v. Thomas, 417 Mass. 782, 790 (1994); 940 C.M.R. 3.16.[1] A finding of negligence requires that the owner knew or reasonably should have known that there was a condition on the property that created an unreasonable risk of injury to the occupants. Young v. Garwacki, 380 Mass. 169-171 (1980). The Massachusetts State Police conducted an investigation into the cause and origin of the fire and determined that it was an accident. The fire, according to the investigation, was ignited by the careless disposal of a cigarette into the bark mulch adjacent to Building 8 at the Dearborn Complex. The Massachusetts State Police did not attribute any fault to the Simpson Entities for the cause and origin of the fire. Thus, there is no evidence of any negligence on the part of any of the Simpson Entities.

---

[1] Indeed, under Massachusetts law, in the absence of negligence by the landlord, a breach of the warranty of habitability does not create strict liability for injury or damage caused by a defect that resulted in a fire. See, e.g., Al-Ziab v. Mourgis, 424 Mass. 847, 850-1 (1997) (tenant must demonstrate that landlord had notice of defect and failed to take appropriate corrective measures). See also, Fletcher v. Littleton, 68 Mass. App. Ct. 22, (2007) (rejecting the notion that landlord was responsible for deaths from a fire in the absence of landlord's knowledge of defective conditions and a failure to institute corrective measures).

Stephen L. D'Angelo, Esq.
Page 3
April 22, 2009

Putting aside the shortcomings in the form of your letter, I would like to take this opportunity to broadly respond to several of the general allegations which you have made.

You claim that the Simpson Entities are liable to Ms. Gardner because they knew or should have known that the bark mulch located around the foundation of Building 8 was flammable, but yet they failed to remove it. There is no evidence, as your letter suggests, that the bark mulch was a "known fire hazard." While there were previous incidents of small fires at the Dearborn Complex that had been reported to the local fire department, those fires were investigated. At no time did either the fire department, or any other agency for that matter, determine that the bark mulch was a fire hazard. Nor did the fire department order the Dearborn Complex to remove the bark mulch. Rest assured, if such an order of removal had been issued, the bark mulch would have been removed immediately. Indeed, there is no evidence that either the fire department or Simpson Property Group, L.P. ("SPG"), the property manager, knew that the bark mulch had any unique characteristics or qualities that made it more flammable than any other type of mulch that is typically used for landscaping purposes anywhere in the Commonwealth of Massachusetts. Thus, until the unfortunate events of May 29, 2008, there was no notice that any fire hazard existed at the Dearborn Complex.

Moreover, after a thorough investigation, the State Police determined that the fire of May 29, 2008 was an accident that was caused by the careless disposal of smoking materials at or near Building 8. The management company for the Dearborn Complex has a strict "No Smoking" policy that prohibits smoking on balconies. The property management company had also placed various notices throughout the complex that clearly and conspicuously requested tenants and the public not to dispose of burning cigarettes into the landscaped flower beds or the mulch. Thus, contrary to your letter, the fire was caused by an unfortunate accident, and not as a direct and proximate result of any negligent act or omission on the part of any of the Simpson Entities.

With respect to the claims in your letter that Ms. Gardner suffered emotional distress as a consequence of any interference with the covenant of quiet enjoyment, your client will need to establish fault on the part of the Simpson Entities. The Simpson Entities deny that they are in any way at fault for the fire, whether the claims asserted by your client sound in simple negligence; as a breach of the implied warranty of habitability; or as a consequence of interference with quiet enjoyment. Putting aside the fact that there is no evidence of fault on the part of the Simpson Entities, and regardless of the underlying theory that is advanced, the facts as asserted in your letter are insufficient to establish the type of harm that is required to support a valid claim for emotional distress.

First, Massachusetts law requires that allegations of emotional distress be corroborated with objective evidence of genuine harm. It is not enough to demonstrate mere dismay, humiliation, grief or anger. See, e.g., Sullivan v. Boston Gas Co., 414 Mass. 129, 137 (1993). While the Simpson Entities certainly sympathize with Ms. Gardner and the various other tenants who were displaced by the unfortunate events of May 29, 2008, your letter fails to provide the

Stephen L. D'Angelo, Esq.
Page 4
April 22, 2009

type of objective corroboration of emotional distress as required under the law. Second, the tragic loss of Ms. Gardner's cat is, without question, an unfortunate incident for which the Simpson Entities express deep sympathy. However, there is no legal basis upon which Ms. Gardner can rest an emotional distress claim for such a loss. See, e.g., Krasnecky v. Meffen, 56 Mass. App. Ct. 418 (2002). Thus, the Simpson Entities deny that they will be found liable to your client for emotional distress.

The credible facts belie the claims in your letter that any of the Simpson Entities violated the law regarding insurance. Per paragraph 8 of the lease agreement dated August 20, 2007, while tenants are required to have liability insurance and only encouraged to purchase insurance coverage for their personal possessions. Indeed, Ms. Gardner's written lease, at paragraph 8, states, in pertinent part, as follows:

"We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

**We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like."**

(emphasis added)

Contrary to your letter, neither Ms. Gardner nor any other tenants were ever coerced into purchasing any other type of insurance. There is likewise no evidence that the Simpson Entities or any SPG employees or leasing agents acted as "insurance agents," or, as your letter claims, that any of the Simpson Entities directly "collected the insurance premiums" for any insurer.[2] Given the ample notice that was provided to prospective tenants regarding required insurance coverage, coupled with the tenant's agreement to pay the said insurance premiums, there is nothing unlawful or improper associated with the landlord thereafter collecting such premiums along with the rent.

_____

[2] In your letter, you claim that the Simpson Entities "collected" insurance premiums and "sold" coverage in contravention of G.L. c. 175, § 164. As stated, no tenant was "sold" insurance by any agent or representative of any of the Simpson Entities. Moreover, to the extent that any premiums were charged to any tenant of the Dearborn Complex for personal liability coverage, and, in turn, paid over to any insurer, this is not a violation of § 16. Indeed, § 16 expressly permits premiums to be "collected" without an insurance license.

Stephen L. D'Angelo, Esq.
Page 5
April 22, 2009

agreement to pay the said insurance premiums, there is nothing unlawful or improper associated

Simply put, your claim that the Simpson Entities engaged in misrepresentation or coercion regarding insurance coverage is without merit. We are confident that when the facts are aired in court, the credible evidence will demonstrate that Ms. Gardner knew or should have known what type of insurance coverage she was required to purchase -- i.e. personal liability coverage -- versus the type of coverage she was encouraged to purchase for her personal property.

The statement in your letter that the Simpson Entities violated G.L. c. 186, § 15 by requiring Ms. Gardner to purchase insurance coverage misstates the facts and the applicable law. First, section 15 prohibits a residential landlord from including a provision in a lease that exonerates or indemnifies the landlord for, or that holds the landlord harmless from, injury, loss or damage arising from the landlord's fault. See G.L. c. 186, § 15. Such provisions are void as against public policy. Id. Here, as stated, the written lease only requires the tenant to purchase insurance for the tenant's own acts or omissions that cause injury, loss or damage. Accordingly, such a provision is not void or illegal as your letter suggests. Nor is such a provision tantamount to misrepresentation as you claim.

With respect to Ms. Gardner's claim for misrepresentation regarding insurance, she will be required to establish that she was deceived into believing that she was purchasing sufficient insurance coverage to cover her property losses in the event of a fire. Given the clear and conspicuous language set forth in her written lease, Ms. Gardner will be hard-pressed to establish that her reliance was reasonable. Moreover, at the time that she initially applied for a tenancy at the Dearborn Complex, and before she signed a lease, she was given the right to review a typical lease contract, as well as any community rules and policies concerning the complex. At that time, she also reviewed and initialed Fairfield's "General Rental and Occupancy Criteria Guidelines," which state, inter alia, as follows:

"Proof of liability insurance with a minimum coverage level of $25,000 is required. Contents coverage is not required, but recommended. You may choose the insurance coverage and policy limits that are most appropriate for your situation, provided a minimum coverage of $25,000 is satisfied. For applicants that do not have a specific insurance agent identified, First American Property & Casualty Insurance Company has made available Registry TLC, a convenient, affordable liability program developed for apartment Tenants. There is no application, no hassle, and your premium is billed monthly to you with your rent. For policy details, please call customer service representatives toll free at (866) 654-9900 or ask our leasing office for an informational brochure."

Stephen L. D'Angelo, Esq.
Page 6
April 22, 2009

Based upon the foregoing facts and analysis, the Simpson Entities reject the settlement demand of $223,798.53 as unreasonable in the extreme, and not either calculated or likely to lead to any "common ground" upon which a compromise might be founded. The Simpson Entities endeavor, whenever possible, to resolve disputes outside of litigation. Without conceding that they are guilty of any error or omission in connection with the events that occurred at the Dearborn Complex on May 29, 2008, and in the interest of reaching an early resolution only, the Simpson Entities are willing to mediate this matter a mutually convenient date and time in the near future.

I look forward to your response.

Very truly yours,

COGAVIN AND WAYSTACK

Edward W. Waystack

HOLLAND & KNIGHT LLP

Damon M. Seligson

EWW/cg

cc    Cassandra M. McCasland, Esq.

# COGAVIN AND WAYSTACK

### ATTORNEYS AT LAW

### ONE CENTER PLAZA

### BOSTON, MASSACHUSETTS 02108

TELEPHONE (617) 742-3340

FACSIMILE (617) 723-7563

LAWRENCE H. BEHRENS *
AUDREY L. BRADLEY
GERARD A. BUTLER
KATHLEEN M. HANSBERRY
ROBERT W. HEALY †
KATHERINE A. KIRBY
DANIEL S. MCINNIS
EDWARD W. WAYSTACK

OF COUNSEL

JAMES B. DOLAN
JOHN P. FITZGERALD
GEORGE F. PARKER, III

* ALSO ADMITTED IN VT
† ALSO ADMITTED IN NH

August 11,  2009

**BY FACSIMILE AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Stephen L. D'Angelo, Esq.
D'Angelo & Hashem, LLC
6 Beacon Street, Suite 505
Boston, Massachusetts 02108

Re:    Tanya M. Peppe et al, Unit 837

## RESPONSE TO WRITTEN DEMAND
## FOR RELIEF UNDER G.L. c. 93A

Dear Mr. D'Angelo:

Please be advised that the law firm of Holland & Knight LLP represents Simpson Financing Limited Partnership ("Simpson FLP"), Simpson Housing LLLP ("Simpson"), SHLP Holdings LLLP ("SHLP"), QRS Financing, LLC ("QRS"), Colomba LLC ("Colomba"), and Paloma, LLC ("Paloma") (collectively, the "Simpson Entities") in connection with the fire that occurred on or about May 29, 2008 at the apartment complex known as *Highlands at Dearborn* in Peabody, Massachusetts (the "Dearborn Complex"). Please be further advised that the law firm of Cogavin & Waystack has been appointed by Interstate Fire and Casualty Company, the general liability carrier for the Dearborn Complex. Your letter, dated July 2, 2009, demanding relief from the Simpson Entities pursuant to Massachusetts General laws c. 93A has been forwarded to me and Damon M. Seligson of Holland & Knight LLP for response.

Stephen L. D'Angelo, Esq.
Page 2
August 11, 2009

This letter will serve to respond to the claim set forth in your letter, wherein you state that you were retained by Tanya Peppe and her son, Robert Pulsciano for damages resulting from the fire which occurred on May 29, 2008 at the Highlands at Dearborn apartment complex, Building 8, in Peabody, Massachusetts. The Simpson Entities, individually and collectively, do not intend, by failing to rebut any specific allegation in your letter, to concede the truth of the same.

At the outset, we do not believe that your letter constitutes a sufficient demand for relief pursuant to the provisions of G.L. c. 93A, § 9. First, your letter speaks in terms of generalities, and provides an inadequate basis upon which any of the Simpson Entities can objectively evaluate the claims which you are trying to make, and formulate an offer of relief. We note that your letter refers to various of the Simpson Entities either being "controlled by", or interrelated to, other Simpson Entities, and improperly reaches the broad conclusion that all are somehow liable to your client as a result of an accidental fire. To clarify, prior to August 17, 2007, Simpson FLP did not own the Dearborn Complex. QRS is the sole general partner of Simpson FLP and Simpson is the sole manager and member of QRS. Colomba is the sole general partner of Simpson. SHLP is a fifty percent (50%) member of Colomba. Paloma is the sole general partner of SHLP. Accordingly, the Simpson Entities are separate and distinct entities. What your letter lacks, however, are specifics as to your client's claims against each of the Simpson Entities.

The conduct which you describe, even if you are able to prove that it took place, does not amount to an "unfair and deceptive practice" as that phrase is used under Massachusetts law. In order for Chapter 93A to apply, there needs to be a substantial and material breach of the implied warranty of habitability that was caused by the landlord's negligence or a failure to comply with existing statutes, rules, regulations or laws meant for the protection of the consumers of this Commonwealth. See Cruz Mgt. Co. v. Thomas, 417 Mass. 782, 790 (1994); 940 C.M.R. 3.16.[1] A finding of negligence requires that the owner knew or reasonably should have known that there was a condition on the property that created an unreasonable risk of injury to the occupants. Young v. Garwacki, 380 Mass. 169-171 (1980). The Massachusetts State Police conducted an investigation into the cause and origin of the fire and determined that it was an accident. The fire, according to the investigation, was ignited by the careless disposal of a cigarette into the bark mulch adjacent to Building 8 at the Dearborn Complex. The Massachusetts State Police did not attribute any fault to the Simpson Entities for the cause and origin of the fire. Thus, there is no evidence of any negligence on the part of any of the Simpson Entities.

---

[1] Indeed, under Massachusetts law, in the absence of negligence by the landlord, a breach of the warranty of habitability does not create strict liability for injury or damage caused by a defect that resulted in a fire. See, e.g., Al-Ziab v. Mourgis, 424 Mass. 847, 850-1 (1997) (tenant must demonstrate that landlord had notice of defect and failed to take appropriate corrective measures). See also, Fletcher v. Littleton, 68 Mass. App. Ct. 22, (2007) (rejecting the notion that landlord was responsible for deaths from a fire in the absence of landlord's knowledge of defective conditions and a failure to institute corrective measures).

Stephen L. D'Angelo, Esq.
Page 3
August 11, 2009

      Putting aside the shortcomings in the form of your letter, I would like to take this opportunity to broadly respond to several of the general allegations which you have made.

      You claim that the Simpson Entities are liable to Ms. Peppe and her son because they knew or should have known that the bark mulch located around the foundation of Building 8 was flammable, but yet they failed to remove it. There is no evidence, as your letter suggests, that the bark mulch was a "known fire hazard." While there were previous incidents of small fires at the Dearborn Complex that had been reported to the local fire department, those fires were investigated. At no time did either the fire department, or any other agency for that matter, determine that the bark mulch was a fire hazard. Nor did the fire department order the Dearborn Complex to remove the bark mulch. Rest assured, if such an order of removal had been issued, the bark mulch would have been removed immediately. Indeed, there is no evidence that either the fire department or Simpson Property Group, L.P. ("SPG"), the property manager, knew that the bark mulch had any unique characteristics or qualities that made it more flammable than any other type of mulch that is typically used for landscaping purposes anywhere in the Commonwealth of Massachusetts. Thus, until the unfortunate events of May 29, 2008, there was no notice that any fire hazard existed at the Dearborn Complex.

      Moreover, after a thorough investigation, the State Police determined that the fire of May 29, 2008 was an accident that was caused by the careless disposal of smoking materials at or near Building 8. The management company for the Dearborn Complex has a strict "No Smoking" policy that prohibits smoking on balconies. The property management company had also placed various notices throughout the complex that clearly and conspicuously requested tenants and the public not to dispose of burning cigarettes into the landscaped flower beds or the mulch. Thus, contrary to your letter, the fire was caused by an unfortunate accident, and not as a direct and proximate result of any negligent act or omission on the part of any of the Simpson Entities.

      With respect to the claims in your letter that Ms. Peppe and her son suffered emotional distress as a consequence of any interference with the covenant of quiet enjoyment, your client will need to establish fault on the part of the Simpson Entities. The Simpson Entities deny that they are in any way at fault for the fire, whether the claims asserted by your client sound in simple negligence; as a breach of the implied warranty of habitability; or as a consequence of interference with quiet enjoyment. Putting aside the fact that there is no evidence of fault on the part of the Simpson Entities, and regardless of the underlying theory that is advanced, the facts as asserted in your letter are insufficient to establish the type of harm that is required to support a valid claim for emotional distress.

Stephen L. D'Angelo, Esq.
Page 4
August 11, 2009

  Massachusetts law requires that allegations of emotional distress be corroborated with objective evidence of genuine harm. It is not enough to demonstrate mere dismay, humiliation, grief or anger. See, e.g., Sullivan v. Boston Gas Co., 414 Mass. 129, 137 (1993). While the Simpson Entities certainly sympathize with Ms. Peppe and the various other tenants who were displaced by the unfortunate events of May 29, 2008, your letter fails to provide the type of objective corroboration of emotional distress as required under the law.. The tragic loss of Ms. Peppe's cats is, without question, an unfortunate incident for which the Simpson Entitles express deep sympathy. However, there is no legal basis upon which Ms. Peppe and her son can rest an emotional distress claim for such a loss. See e.g., Krasnecky v. Meffen, 53 Mass. App. Ct. 417 (2002). I point out that Ms. Peppe did not list any pets on the pet addendum she signed on March 25, 2008. Thus, the Simpson Entities deny that they will be found liable to your client for emotional distress.

  With respect to the claims in your letter that the Simpson Entities violated the law governing insurance, such claims are likewise without merit. Thus, to the extent that Ms. Peppe and her son contend that they were subjected to improper or unlawful sales methods, such claims are not appropriate.

  The credible facts belie the claim in your letter that any of the Simpson entities violated the law regarding insurance. At the time the lease was signed, Ms. Peppe was informed that she was required to have personal liability insurance. This requirement is expressed at Paragraph 8 of the written lease. As is SPG's policy, while tenants are required to have liability insurance, tenants were only encouraged to purchase insurance coverage for their personal possessions. Indeed, Ms. Peppe's written lease, at paragraph 8, states, in pertinent part, as follows:

   "We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

   **We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like.**"

(emphasis added)

Stephen L. D'Angelo, Esq.
Page 5
August 11, 2009

Contrary to your letter, neither Ms. Peppe and her son nor any other tenants were ever coerced into purchasing any other type of insurance.   If anything, SPG's leasing agents did nothing more than inform tenants such as Ms. Peppe that they could contact a representative from First American Property & Casualty to discuss their own specific insurance needs, or that they were free to contact any other insurer of their choosing to inquire about coverage for their personal property.   There is likewise no evidence that the Simpson Entities or any SPG employees or leasing agents acted as "insurance agents," or, as your letter claims, that any of the Simpson Entities directly "collected the insurance premiums" for any insurer.[2]  Given the ample notice that was provided to prospective tenants regarding required insurance coverage, coupled with the tenant's agreement to pay the said insurance premiums, there is nothing unlawful or improper associated with the landlord thereafter collecting such premiums along with the rent.

Simply put, your claim that the Simpson Entities engaged in misrepresentation or coercion regarding insurance coverage is without merit.  We are confident that when the facts are aired in court, the credible evidence will demonstrate that Ms. Peppe knew or should have known what type of insurance coverage she was required to purchase -- i.e. personal liability coverage -- versus the type of coverage she was encouraged to purchase for her personal property.

The statement in your letter that the Simpson Entities violated G.L. c. 186, § 15 by requiring Ms. Peppe to purchase insurance coverage misstates the facts and the applicable law. First, section 15 prohibits a residential landlord from including a provision in a lease that exonerates or indemnifies the landlord for, or that holds the landlord harmless from, injury, loss or damage arising from the landlord's fault.  See G.L. c. 186, § 15.  Such provisions are void as against public policy.  Id.  Here, as stated, the written lease only requires the tenant to purchase insurance for the tenant's own acts or omissions that cause injury, loss or damage.  Accordingly, such a provision is not void or illegal as your letter suggests.  Nor is such a provision tantamount to misrepresentation as you claim.

With respect to Ms. Peppe's claim for misrepresentation regarding insurance, she will be required to establish that she was deceived into believing that she was purchasing sufficient insurance coverage to cover her property losses in the event of a fire.  Given the clear and conspicuous language set forth in her written lease, Ms. Peppe will be hard-pressed to

---

[2] In your letter, you claim that the Simpson Entities "collected" insurance premiums and "sold" coverage in contravention of G.L. c. 175, § 164.  As stated, no tenant was "sold" insurance by any agent or representative of any of the Simpson Entities.  Moreover, to the extent that any premiums were charged to any tenant of the Dearborn Complex for personal liability coverage, and, in turn, paid over to any insurer, this is not a violation of § 16.  Indeed, § 16 expressly permits premiums to be "collected" without an insurance license.

Stephen L. D'Angelo, Esq
Pa ge 6
August 11, 2009

establish that her reliance was reasonable.  Moreover, at the time that she initially applied for a tenancy at the Dearborn Complex, and before she signed a lease, she was given the right to review a typical lease contract, as well as any community rules and policies concerning the complex.  On March 25, 2008, Ms. Peppe signed a written lease Addendum expressly acknowledging in Paragraph 2 that the landlord does "not maintain insurance to protect you against loss or damage to your personal property or belongings...".

This same "Lease Addendum - Liability Insurance Required of Resident" signed by Ms. Peppe on March 25, 2008 clearly and conspicuously explains the nature of the required liability insurance.  This same form states, in pertinent part, as follows:

> "You acknowledge that we have made no referrals, guarantees, representations, or promises whatsoever concerning any insurance or services provided by any insurance company.  You were and are free to contract for the required insurance with the provider of your choosing."

Given the numerous instances in which your client, Ms. Peppe, was provided with detailed information regarding the nature of the insurance coverage required for any tenancy at the Dearborn Complex at the time she first entered into her lease on March 25, 2008,  we are confident that her misrepresentation claim will fail.

Ms. Peppe had an opportunity under the lease signed on March 25, 2008 and under the "Lease Addendum - Liability Insurance Required of Resident" signed by Ms. Peppe on March 25, 2008, to review insurance provisions.  Both of these documents indicated that contents coverage is not required.

Based upon the foregoing facts and analysis, the Simpson Entities reject the settlement demand of $443,755.57 as unreasonable in the extreme, and not either calculated or likely to lead to any "common ground" upon which a compromise might be founded.  The Simpson Entities endeavor, whenever possible, to resolve disputes outside of litigation.  Without conceding that they are guilty of any error or omission in connection with the events that occurred at the Dearborn Complex on May 29, 2008, and in the interest of reaching an early resolution only, the Simpson Entities are willing to mediate this matter a mutually convenient date and time in the near future.

Stephen L. D'Angelo, Esq.
Page 7
August 11, 2009


     I look forward to your response.

                    Very truly yours,

                    **COGAVIN AND WAYSTACK**

                    Edward W. Waystack

                    **HOLLAND & KNIGHT LLP**

                    Damon M. Seligson

EWW/cg

cc    Cassandra M. McCasland, Esq.

# COGAVIN AND WAYSTACK

## ATTORNEYS AT LAW
### ONE CENTER PLAZA
### BOSTON, MASSACHUSETTS 02108

TELEPHONE (617) 742-3340

FACSIMILE (617) 723-7563

LAWRENCE H. BEHRENS *
AUDREY L. BRADLEY
GERARD A. BUTLER
KATHLEEN M. HANSBERRY
ROBERT W. HEALY †
KATHERINE A. KIRBY
DANIEL S. McINNIS
EDWARD W. WAYSTACK

* ALSO ADMITTED IN VT
† ALSO ADMITTED IN NH

OF COUNSEL

JAMES B. DOLAN
JOHN P. FITZGERALD
GEORGE F. PARKER, III

April 22, 2009

**BY FACSIMILE AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Stephen L. D'Angelo, Esq.
D'Angelo & Hashem, LLC
6 Beacon Street, Suite 505
Boston, Massachusetts 02108

Re:   Crystal Caissie, Unit 839

### RESPONSE TO WRITTEN DEMAND
### FOR RELIEF UNDER G.L. c. 93A

Dear Mr. D'Angelo:

Please be advised that the law firm of Holland & Knight LLP represents Simpson Financing Limited Partnership ("Simpson FLP"), Simpson Housing LLLP ("Simpson"), SHLP Holdings LLLP ("SHLP"), QRS Financing, LLC ("QRS"), Colomba LLC ("Colomba"); and Paloma, LLC ("Paloma") (collectively, the "Simpson Entities") in connection with the fire that occurred on or about May 29, 2008 at the apartment complex known as *Highlands at Dearborn* in Peabody, Massachusetts (the "Dearborn Complex"). Please be further advised that the law firm of Cogavin & Waystack has been appointed by Interstate Fire and Casualty Company, the general liability carrier for the Dearborn Complex. Your letter, dated March 25, 2009, demanding relief from the Simpson Entities pursuant to Massachusetts General laws c. 93A has been forwarded to me and Damon M. Seligson of Holland & Knight LLP for response.

Stephen L. D'Angelo, Esq.
Page 2
April 22, 2009

This letter will serve to respond to the claims set forth in your letter. The Simpson Entities, individually and collectively, do not intend, by failing to rebut any specific allegation in your letter, to concede the truth of the same.

At the outset, we do not believe that your letter constitutes a sufficient demand for relief pursuant to the provisions of G.L. c. 93A, § 9. First, your letter speaks in terms of generalities, and provides an inadequate basis upon which any of the Simpson Entities can objectively evaluate the claims which you are trying to make, and formulate an offer of relief. We note that your letter refers to various of the Simpson Entities either being "controlled by", or interrelated to, other Simpson Entities, and improperly reaches the broad conclusion that all are somehow liable to your client as a result of an accidental fire. To clarify, prior to August 17, 2007, Simpson FLP did not own the Dearborn Complex. QRS is the sole general partner of Simpson FLP and Simpson is the sole manager and member of QRS. Colomba is the sole general partner of Simpson. SHLP is a fifty percent (50%) member of Colomba. Paloma is the sole general partner of SHLP. Accordingly, the Simpson Entities are separate and distinct entities. What your letter lacks, however, are specifics as to your client's claims against each of the Simpson Entities.

Second, the conduct which you describe, even if you are able to prove that it took place, does not amount to an "unfair and deceptive practice" as that phrase is used under Massachusetts law. In order for Chapter 93A to apply, there needs to be a substantial and material breach of the implied warranty habitability that was caused by the landlord's negligence or a failure to comply with existing statutes, rules, regulations or laws meant for the protection of the consumers of this Commonwealth. See Cruz Mgt. Co. v. Thomas, 417 Mass. 782, 790 (1994); 940 C.M.R. 3.16.[1] A finding of negligence requires that the owner knew or reasonably should have known that there was a condition on the property that created an unreasonable risk of injury to the occupants. Young v. Garwacki, 380 Mass. 169-171 (1980). The Massachusetts State Police conducted an investigation into the cause and origin of the fire and determined that it was an accident. The fire, according to the investigation, was ignited by the careless disposal of a cigarette into the bark mulch adjacent to Building 8 at the Dearborn Complex. The Massachusetts State Police did not attribute any fault to the Simpson Entities for the cause and origin of the fire. Thus, there is no evidence of any negligence on the part of any of the Simpson Entities.

Putting aside the shortcomings in the form of your letter, I would like to take this opportunity to broadly respond to several of the general allegations which you have made.

---

[1] Indeed, under Massachusetts law, in the absence of negligence by the landlord, a breach of the warranty of habitability does not create strict liability for injury or damage caused by a defect that resulted in a fire. See, e.g., Al-Ziab v. Mourgis, 424 Mass. 847, 850-1 (1997) (tenant must demonstrate that landlord had notice of defect and failed to take appropriate corrective measures). See also, Fletcher v. Littleton, 68 Mass. App. Ct. 22, (2007) (rejecting the notion that landlord was responsible for deaths from a fire in the absence of landlord's knowledge of defective conditions and a failure to institute corrective measures).

Stephen L. D'Angelo, Esq.
Page 3
April 22, 2009

You claim that the Simpson Entities are liable to Ms. Caissie because they knew or should have known that the bark mulch located around the foundation of Building 8 was flammable, but yet they failed to remove it. There is no evidence, as your letter suggests, that the bark mulch was a "known fire hazard." While there were previous incidents of small fires at the Dearborn Complex that had been reported to the local fire department, those fires were investigated. At no time did either the fire department, or any other agency for that matter, determine that the bark mulch was a fire hazard. Nor did the fire department order the Dearborn Complex to remove the bark mulch. Rest assured, if such an order of removal had been issued, the bark mulch would have been removed immediately. Indeed, there is no evidence that either the fire department Simpson Property Group, L.P. ("SPG"), the property manager, knew that the bark mulch had any unique characteristics or qualities that made it more flammable than any other type of mulch that is typically used for landscaping purposes anywhere in the Commonwealth of Massachusetts. Thus, until the unfortunate events of May 29, 2008, there was no notice that any fire hazard existed at the Dearborn Complex.

Moreover, after a thorough investigation, the State Police determined that the fire of May 29, 2008 was an accident that was caused by the careless disposal of smoking materials at or near Building 8. The management company for the Dearborn Complex has a strict "No Smoking" policy that prohibits smoking on balconies. The property management company had also placed various notices throughout the complex that clearly and conspicuously requested tenants and the public not to dispose of burning cigarettes into the landscaped flower beds or the mulch. Thus, contrary to your letter, the fire was caused by an unfortunate accident, and not as a direct and proximate result of any negligent act or omission on the part of any of the Simpson Entities.

With respect to the claims in your letter that Ms. Caissie suffered emotional distress as a consequence of any interference with the covenant of quiet enjoyment, your client will need to establish fault on the part of the Simpson Entities. The Simpson Entities deny that they are in any way at fault for the fire, whether the claims asserted by your client sound in simple negligence; as a breach of the implied warranty of habitability; or as a consequence of interference with quiet enjoyment. Putting aside the fact that there is no evidence of fault on the part of the Simpson Entities, and regardless of the underlying theory that is advanced, the facts as asserted in your letter are insufficient to establish the type of harm that is required to support a valid claim for emotional distress.

First, Massachusetts law requires that allegations of emotional distress be corroborated with objective evidence of genuine harm. It is not enough to demonstrate mere dismay, humiliation, grief or anger. See, e.g., Sullivan v. Boston Gas Co., 414 Mass. 129, 137 (1993). While the Simpson Entities certainly sympathize with Ms. Caissie and the various other tenants who were displaced by the unfortunate events of May 29, 2008, your letter fails to provide the type of objective corroboration of emotional distress as required under the law. Second, the tragic loss of Ms. Caissie's two cats and two dogs is, without question, an unfortunate incident

Stephen L. D'Angelo, Esq.
Page 4
April 22, 2009

for which the Simpson Entities express deep sympathy. We bring to your attention that Ms. Caissie only registered two pets in accordance with the terms of her lease. You allege in your demand letter that Ms. Caissie lost four pets in the fire. This is a violation of the pet provisions of said lease. Notwithstanding that fact, there is no legal basis upon which Ms. Caissie can rest an emotional distress claim for such a loss. See, e.g., Krasnecky v. Meffen, 56 Mass. App. Ct. 418 (2002). Thus, the Simpson Entities deny that they will be found liable to your client for emotional distress.

With respect to the claims in your letter that the Simpson Entities violated the law governing insurance, such claims are likewise without merit. First, Ms. Caissie had already entered into a tenancy relationship with BVT/Fairfield Peabody Associates, LLP ("Fairfield"), the former owner of the Dearborn Complex. Thus, to the extent that Ms. Caissie contends that she was subjected to improper or unlawful sales methods by her former landlord, such claims are inapplicable to the Simpson Entities.

Second, the credible facts belie the claims in your letter that any of the Simpson Entities violated the law regarding insurance after the property was sold by Fairfield. In or about March 2008, and after the property had been sold to Simpson FLP, Ms. Caissie renewed her existing lease. At the time the lease was renewed, Ms. Caissie was informed that she was required to have personal liability insurance. This requirement is expressed at paragraph 8 of the written lease. As is SPG's policy, while tenants are required to have liability insurance, tenants were only encouraged to purchase insurance coverage for their personal possessions. Indeed, Ms. Caissie's written lease, at paragraph 8, states, in pertinent part, as follows:

We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

**We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like."**

(emphasis added)

Stephen L. D'Angelo, Esq.
Page 5
April 22, 2009

     Contrary to your letter, neither Ms. Dzamba nor any other tenants were ever coerced into purchasing any other type of insurance. If anything, SPG's leasing agents did nothing more than inform tenants such as Ms. Dzamba that they could contact a representative from First American Property & Casualty to discuss their own specific insurance needs, or that they were free to contact any other insurer of their choosing to inquire about coverage for their personal property. There is likewise no evidence that the Simpson Entities or any SPG employees or leasing agents acted as "insurance agents," or, as your letter claims, that any of the Simpson Entities directly "collected the insurance premiums" for any insurer.[2] Given the ample notice that was provided to prospective tenants regarding required insurance coverage, coupled with the tenant's agreement to pay the said insurance premiums, there is nothing unlawful or improper associated with the landlord thereafter collecting such premiums along with the rent.

     Simply put, your claim that the Simpson Entities engaged in misrepresentation or coercion regarding insurance coverage is without merit. We are confident that when the facts are aired in court, the credible evidence will demonstrate that Ms. Caissie knew or should have known what type of insurance coverage she was required to purchase -- i.e. personal liability coverage -- versus the type of coverage she was encouraged to purchase for her personal property.

     The statement in your letter that the Simpson Entities violated G.L. c. 186, §15 by requiring Ms. Caissie to purchase insurance coverage misstates the facts and the applicable law. First, section 15 prohibits a residential landlord from including a provision in a lease that exonerates or indemnifies the landlord for, or that holds the landlord harmless from, injury, loss or damage arising from the landlord's fault. See G.L. c. 186, § 15. Such provisions are void as against public policy. Id. Here, as stated, the written lease only requires the tenant to purchase insurance for the tenant's own acts or omissions that cause injury, loss or damage. Accordingly, such a provision is not void or illegal as your letter suggests. Nor is such a provision tantamount to misrepresentation as you claim.

     With respect to Ms. Caissie's claim for misrepresentation regarding insurance, she will be required to establish that she was deceived into believing that she was purchasing sufficient insurance coverage to cover her property losses in the event of a fire. Given the clear and conspicuous language set forth in her written lease, Ms. Caissie will be hard-pressed to establish that her reliance was reasonable. Moreover, at the time that she initially applied for a tenancy at the Dearborn Complex, and before she signed a lease, she was given the right to review a typical lease contract, as well as any

---

[2] In your letter, you claim that the Simpson Entities "collected" insurance premiums and "sold" coverage in contravention of G.L. c. 175, § 164. As stated, no tenant was "sold" insurance by any agent or representative of any of the Simpson Entities. Moreover, to the extent that any premiums were charged to any tenant of the Dearborn Complex for personal liability coverage, and, in turn, paid over to any insurer, this is not a violation of § 16. Indeed, § 16 expressly permits premiums to be "collected" without an insurance license.

Stephen L. D'Angelo, Esq.
Page 6
April 22, 2009

community rules and policies concerning the complex. At that time, she also reviewed and initialed Fairfield's "General Rental and Occupancy Criteria Guidelines," which state, inter alia, as follows:

> "Proof of liability insurance with a minimum coverage level of $25,000 is required. Contents coverage is not required, but recommended. You may choose the insurance coverage and policy limits that are most appropriate for your situation, provided a minimum coverage of $25,000 is satisfied. For applicants that do not have a specific insurance agent identified, First American Property & Casualty Insurance Company has made available Registry TLC, a convenient, affordable liability program developed for apartment Tenants. There is no application, no hassle, and your premium is billed monthly to you with your rent. For policy details, please call customer service representatives toll free at (866) 654-9900 or ask our leasing office for an informational brochure."

The same policy was in existence when Ms. Caissie renewed her lease in March 2008. In fact, at the time she signed the renewal, Ms. Caissie signed a form entitled "Lease Addendum -- Liability Insurance Required of Resident" which clearly and conspicuously explains the nature of the required liability insurance. The same form states, in pertinent part, as follows:

> "You acknowledge that we have made no referrals, guarantees, representations, or promises whatsoever concerning any insurance or services provided by any insurance company. You were and are free to contract for the required insurance with the provider of your choosing."

Given the numerous instances and occasions in which your client was provided with detailed information regarding the nature of the insurance coverage required for any tenancy at the Dearborn Complex, both at the time she first entered into her lease, and at the time she renewed the same, we are confident that her misrepresentation claim will fail.

Based upon the foregoing facts and analysis, the Simpson Entities reject the settlement demand of $343,081.43 as unreasonable in the extreme, and not either calculated or likely to lead to any "common ground" upon which a compromise might be founded. The Simpson Entities endeavor, whenever possible, to resolve disputes outside of litigation. Without conceding that they are guilty of any error or omission in connection with the events that occurred at the Dearborn Complex on May 29, 2008, and in the interest of reaching an early resolution only, the Simpson Entities are willing to mediate this matter a mutually convenient date and time in the near future.

Stephen L. D'Angelo, Esq.
Page 7
April 22, 2009

I look forward to your response.

Very truly yours,

COGAVIN AND WAYSTACK

Edward W. Waystack

HOLLAND & KNIGHT LLP

Damon M. Seligson

EWW/cg

cc      Cassandra M. McCasland, Esq.

# COGAVIN AND WAYSTACK

### ATTORNEYS AT LAW
### ONE CENTER PLAZA
### BOSTON, MASSACHUSETTS 02108

#### TELEPHONE (617) 742-3340
#### FACSIMILE (617) 723-7563

LAWRENCE H. BEHRENS *
AUDREY L. BRADLEY
GERARD A. BUTLER
KATHLEEN M. HANSBERRY
ROBERT W. HEALY †
KATHERINE A. KIRBY
DANIEL S. McINNIS
EDWARD W. WAYSTACK

* ALSO ADMITTED IN VT
† ALSO ADMITTED IN NH

OF COUNSEL

JAMES B. DOLAN
JOHN P. FITZGERALD
GEORGE F. PARKER, III

July 8, 2009

**BY FACSIMILE AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Stephen L. D'Angelo, Esq.
D'Angelo & Hashem, LLC
6 Beacon Street, Suite 505
Boston, Massachusetts 02108

Re:    Louise Felteau, Unit 823

## RESPONSE TO WRITTEN DEMAND
## FOR RELIEF UNDER G.L. c. 93A

Dear Mr. D'Angelo:

Please be advised that the law firm of Holland & Knight LLP represents Simpson Financing Limited Partnership ("Simpson FLP"), Simpson Housing LLLP ("Simpson"), SHLP Holdings LLLP ("SHLP"), QRS Financing, LLC ("QRS"), Colomba LLC ("Colomba"), and Paloma, LLC ("Paloma") (collectively, the "Simpson Entities") in connection with the fire that occurred on or about May 29, 2008 at the apartment complex known as *Highlands at Dearborn* in Peabody, Massachusetts (the "Dearborn Complex"). Please be further advised that the law firm of Cogavin & Waystack has been appointed by Interstate Fire and Casualty Company, the general liability carrier for the Dearborn Complex. Your letter, dated May 26, 2009, demanding relief from the Simpson Entities pursuant to Massachusetts General laws c. 93A has been forwarded to me and Damon M. Seligson of Holland & Knight LLP for response.

Stephen L. D'Angelo, Esq.
Page 2
July 8, 2009

This letter will serve to respond to the claim set forth in your letter, wherein you state that you were retained by Louise Felteau for damages resulting from the fire which occurred on May 29, 2008 at the Highlands at Dearborn apartment complex, Building 8, in Peabody, Massachusetts. . The Simpson Entities, individually and collectively, do not intend, by failing to rebut any specific allegation in your letter, to concede the truth of the same.

Your factual allegations are not accurate. Ms. Felteau's lease was not a renewal lease, and it was signed November 27, 2007, not December 5, 2007 as alleged. Ms Felteau's lease was to commence December 1, 2007.

At the outset, we do not believe that your letter constitutes a sufficient demand for relief pursuant to the provisions of G.L. c. 93A, § 9. First, your letter speaks in terms of generalities, and provides an inadequate basis upon which any of the Simpson Entities can objectively evaluate the claims which you are trying to make, and formulate an offer of relief. We note that your letter refers to various of the Simpson Entities either being "controlled by", or interrelated to, other Simpson Entities, and improperly reaches the broad conclusion that all are somehow liable to your client as a result of an accidental fire. To clarify, prior to August 17, 2007, Simpson FLP did not own the Dearborn Complex. QRS is the sole general partner of Simpson FLP and Simpson is the sole manager and member of QRS. Colomba is the sole general partner of Simpson. SHLP is a fifty percent (50%) member of Colomba. Paloma is the sole general partner of SHLP. Accordingly, the Simpson Entities are separate and distinct entities. What your letter lacks, however, are specifics as to your client's claims against each of the Simpson Entities.

Second, the conduct which you describe, even if you are able to prove that it took place, does not amount to an "unfair and deceptive practice" as that phrase is used under Massachusetts law. In order for Chapter 93A to apply, there needs to be a substantial and material breach of the implied warranty of habitability that was caused by the landlord's negligence or a failure to comply with existing statutes, rules, regulations or laws meant for the protection of the consumers of this Commonwealth. See Cruz Mgt. Co. v. Thomas, 417 Mass. 782, 790 (1994); 940 C.M.R. 3.16.[1] A finding of negligence requires that the owner knew or reasonably should have known that there was a condition on the property that created an unreasonable risk of injury to the occupants. Young v. Garwacki, 380 Mass. 169-171 (1980). The Massachusetts State Police conducted an investigation into the cause and origin of the fire and determined that it was an accident. The

---

[1] Indeed, under Massachusetts law, in the absence of negligence by the landlord, a breach of the warranty of habitability does not create strict liability for injury or damage caused by a defect that resulted in a fire. See, e.g., Al-Ziab v. Mourgis, 424 Mass. 847, 850-1 (1997) (tenant must demonstrate that landlord had notice of defect and failed to take appropriate corrective measures). See also, Fletcher v. Littleton, 68 Mass. App. Ct. 22, (2007) (rejecting the notion that landlord was responsible for deaths from a fire in the absence of landlord's knowledge of defective conditions and a failure to institute corrective measures).

Stephen L. D'Angelo, Esq.
Page 3
July 8, 2009

fire, according to the investigation, was ignited by the careless disposal of a cigarette into the bark mulch adjacent to Building 8 at the Dearborn Complex. The Massachusetts State Police did not attribute any fault to the Simpson Entities for the cause and origin of the fire. Thus, there is no evidence of any negligence on the part of any of the Simpson Entities.

Putting aside the shortcomings in the form of your letter, I would like to take this opportunity to broadly respond to several of the general allegations which you have made.

You claim that the Simpson Entities are liable to Ms. Felteau because they knew or should have known that the bark mulch located around the foundation of Building 8 was flammable, but yet they failed to remove it. There is no evidence, as your letter suggests, that the bark mulch was a "known fire hazard." While there were previous incidents of small fires at the Dearborn Complex that had been reported to the local fire department, those fires were investigated. At no time did either the fire department, or any other agency for that matter, determine that the bark mulch was a fire hazard. Nor did the fire department order the Dearborn Complex to remove the bark mulch. Rest assured, if such an order of removal had been issued, the bark mulch would have been removed immediately. Indeed, there is no evidence that either the fire department or Simpson Property Group, L.P. ("SPG"), the property manager, knew that the bark mulch had any unique characteristics or qualities that made it more flammable than any other type of mulch that is typically used for landscaping purposes anywhere in the Commonwealth of Massachusetts. Thus, until the unfortunate events of May 29, 2008, there was no notice that any fire hazard existed at the Dearborn Complex.

Moreover, after a thorough investigation, the State Police determined that the fire of May 29, 2008 was an accident that was caused by the careless disposal of smoking materials at or near Building 8. The management company for the Dearborn Complex has a strict "No Smoking" policy that prohibits smoking on balconies. The property management company had also placed various notices throughout the complex that clearly and conspicuously requested tenants and the public not to dispose of burning cigarettes into the landscaped flower beds or the mulch. Thus, contrary to your letter, the fire was caused by an unfortunate accident, and not as a direct and proximate result of any negligent act or omission on the part of any of the Simpson Entities.

With respect to the claims in your letter that Ms. Felteau suffered emotional distress as a consequence of any interference with the covenant of quiet enjoyment, your client will need to establish fault on the part of the Simpson Entities. The Simpson Entities deny that they are in any way at fault for the fire, whether the claims asserted by your client sound in simple negligence; as a breach of the implied warranty of habitability; or as a consequence of interference with quiet enjoyment. Putting aside the fact that there is no evidence of fault on the part of the Simpson Entities, and regardless of the underlying theory that is advanced, the facts as asserted in your letter are insufficient to establish the type of harm that is required to support a valid claim for emotional distress.

Stephen L. D'Angelo, Esq.
Page 4
July 8, 2009

The allegation that Simpson violated the provisions of Massachusetts General Laws, Chapter 175, Section 99, 15thA, is without merit. Ms. Felteau was paid $1,503.56 in associated relocation costs. Thus, factually and legally, there is no violation of Massachusetts General Laws Chapter 93A.

First, Massachusetts law requires that allegations of emotional distress be corroborated with objective evidence of genuine harm. It is not enough to demonstrate mere dismay, humiliation, grief or anger. See, e.g., Sullivan v. Boston Gas Co., 414 Mass. 129, 137 (1993). While the Simpson Entities certainly sympathize with Ms. Felteau and the various other tenants who were displaced by the unfortunate events of May 29, 2008, your letter fails to provide the type of objective corroboration of emotional distress as required under the law. Second, the tragic loss of Ms. Felteau's cat is, without question, an unfortunate incident for which the Simpson Entities express deep sympathy. However, there is no legal basis upon which Ms. Felteau can rest an emotional distress claim for such a loss. See, e.g., Krasnecky v. Meffen, 53 Mass. App. Ct. 417 (2002). Thus, the Simpson Entities deny that they will be found liable to your client for emotional distress.

With respect to the claims in your letter that the Simpson Entities violated the law governing insurance, such claims are likewise without merit. Thus, to the extent that Ms. Felteau contends that she was subjected to improper or unlawful sales methods, such claims are not appropriate.

The credible facts belie the claim in your letter that any of the Simpson entities violated the law regarding insurance. At the time the lease was signed, Ms. Felteau was informed that she was required to have personal liability insurance. This requirement is expressed at Paragraph 8 of the written lease. As is SPG's policy, while tenants are required to have liability insurance, tenants were only encouraged to purchase insurance coverage for their personal possessions. Indeed, Ms. Felteau's written lease, at paragraph 8, states, in pertinent part, as follows:

"We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like."

(emphasis added)

Stephen L. D'Angelo, Esq.
Page 5
July 8, 2009

Contrary to your letter, neither Ms. Felteau nor any other tenants were ever coerced into purchasing any other type of insurance.   If anything, SPG's leasing agents did nothing more than inform tenants such as Ms. Felteau that they could contact a representative from First American Property & Casualty to discuss their own specific insurance needs, or that they were free to contact any other insurer of their choosing to inquire about coverage for their personal property.   There is likewise no evidence that the Simpson Entities or any SPG employees or leasing agents acted as "insurance agents," or, as your letter claims, that any of the Simpson Entities directly "collected the insurance premiums" for any insurer.[2]  Given the ample notice that was provided to prospective tenants regarding required insurance coverage, coupled with the tenant's agreement to pay the said insurance premiums, there is nothing unlawful or improper associated with the landlord thereafter collecting such premiums along with the rent.

Simply put, your claim that the Simpson Entities engaged in misrepresentation or coercion regarding insurance coverage is without merit.   We are confident that when the facts are aired in court, the credible evidence will demonstrate that Ms. Felteau knew or should have known what type of insurance coverage she was required to purchase -- i.e. personal liability coverage -- versus the type of coverage she was encouraged to purchase for her personal property.

The statement in your letter that the Simpson Entities violated G.L. c. 186, § 15 by requiring Ms. Felteau to purchase insurance coverage misstates the facts and the applicable law. First, section 15 prohibits a residential landlord from including a provision in a lease that exonerates or indemnifies the landlord for, or that holds the landlord harmless from, injury, loss or damage arising from the landlord's fault.  See G.L. c. 186, § 15.  Such provisions are void as against public policy.  Id.  Here, as stated, the written lease only requires the tenant to purchase insurance for the tenant's own acts or omissions that cause injury, loss or damage.  Accordingly, such a provision is not void or illegal as your letter suggests.  Nor is such a provision tantamount to misrepresentation as you claim.

With respect to Ms. Felteau's claim for misrepresentation regarding insurance, she will be required to establish that she was deceived into believing that she was purchasing sufficient insurance coverage to cover her property losses in the event of a fire.  Given the clear and conspicuous language set forth in her written lease, Ms. Felteau will be hard-pressed to establish that her reliance was reasonable.  Moreover, at the time that she initially applied for a tenancy at the Dearborn Complex, and before she signed a lease, she was given the right to review a typical lease contract, as well as any community rules and policies concerning the complex.  On

---

[2] In your letter, you claim that the Simpson Entities "collected" insurance premiums and "sold" coverage in contravention of G.L. c. 175, § 164.  As stated, no tenant was "sold" insurance by any agent or representative of any of the Simpson Entities.  Moreover, to the extent that any premiums were charged to any tenant of the Dearborn Complex for personal liability coverage, and, in turn, paid over to any insurer, this is not a violation of § 16.  Indeed, § 16 expressly permits premiums to be "collected" without an insurance license.

Stephen L. D'Angelo, Esq.
Page 6
July 8, 2009

November 27, 2007, Ms. Felteau signed a written lease Addendum expressly acknowledging in Paragraph 2 that the landlord does "not maintain insurance to protect you against loss or damage to your personal property or belongings...". She did purchase personal property insurance and personal liability insurance, b ut she subsequently notified the landlord of her intention to cancel the same on May 21, 2008. Ms. Felteau gave Simpson notice that she had cancelled her insurance and purchased insurance from Commerce Insurance Company.

This same "Lease Addendum - Liability Insurance Required of Resident" signed by Ms. Felteau on November 27, 2007 clearly and conspicuously explains the nature of the required liability insurance. This same form states, in pertinent part, as follows:

"You acknowledge that we have made no referrals, guarantees, representations, or promises whatsoever concerning any insurance or services provided by any insurance company. You were and are free to contract for the required insurance with the provider of your choosing."

Given the numerous instances in which your client, Ms. Felteau, was provided with detailed information regarding the nature of the insurance coverage required for any tenancy at the Dearborn Complex at the time she first entered into her lease on November 27, 2007, we are confident that her misrepresentation claim will fail.

Ms. Felteau had an opportunity under the lease signed on November 27, 2007 and under the "Lease Addendum - Liability Insurance Required of Resident" signed by Ms. Felteau on November 27. 2007, to review insurance provisions. Both of these documents indicated that contents coverage is not required.

Additionally, according to Ms. Felteau's tenant file, on May 21, 2008 informed the management company that she was cancelling her current insurance effective June 1, 2008. Ms. Felteau provided a copy of proof of new coverage with the Citation Company (a division of Commerce Insurance). Ms. Felteau indicated in this letter dated May 21, 2008 that the new policy went into effect as of May 22, 2008. This action taken by Ms. Felteau is yet another clear indication that she was fully aware of the insurance provisions in the lease and the addendum thereto.

Based upon the foregoing facts and analysis, the Simpson Entities reject the settlement demand of $338,992.02 as unreasonable in the extreme, and not either calculated or likely to lead to any "common ground" upon which a compromise might be founded. The Simpson Entities endeavor, whenever possible, to resolve disputes outside of litigation. Without conceding that they are guilty of any error or omission in connection with the events that occurred at the Dearborn Complex on May 29, 2008, and in the interest of reaching an early resolution only, the Simpson Entities are willing to mediate this matter a mutually convenient date and time in the near future.

Stephen L. D'Angelo, Esq.
Page 7
July 8, 2009

I look forward to your response.

Very truly yours,

COGAVIN AND WAYSTACK

Edward W. Waystack

HOLLAND & KNIGHT LLP

Damon M. Seligson

EWW/cg

cc    Cassandra M. McCasland, Esq.